MARION F. EDWARDS, Judge.
 

 Un this criminal matter, defendant/appellant, Warren Cochran (“Cochran”), appeals his conviction and sentence on a charge of the second degree murder of Joseph Corceller in violation of La. R.S. 14:30.1. Cochran was tried by a jury and found guilty as charged. After post-trial defense motions for a new trial and for post-verdict judgment of acquittal were denied, he was sentenced to a term of life imprisonment without benefits. Cochran
 
 *500
 
 filed a timely appeal with this Court, arguing the evidence presented by the State was legally insufficient to support the conviction. For reasons that follow, we affirm.
 

 FACTS
 

 At approximately 7:46 p.m. on Sunday, February 25, 2007, Deputy Edward Ducos (“Deputy Ducos”) of the Jefferson Parish Sheriffs Office went to an apartment complex on Riverside Drive in Metairie, Louisiana, in response to a call to check on Joseph Corceller (“Corceller”). Relatives called the police out of | ¡¡concern for Cor-celler because they had not heard from him since Thursday night. Using a key given to him by one of the concerned relatives, the officer unlocked the door and entered the apartment. The body of Cor-celler was found lying facedown on the bathroom floor of his apartment surrounded in blood.
 

 The investigating officer notified the Jefferson Parish Sheriffs Office and Detective Nicholas Vega (“Detective Vega”) responded to the scene. According to Detective Vega, it was concluded that Corcel-ler was probably urinating when he was attacked from behind by someone wielding a knife. The toilet seat was raised, and the toilet contained yellow water that looked and smelled like urine. Detective Vega testified that the shower curtain was ripped from the rod and the rod was down. He also stated that he noticed that Corcel-ler was gripping the door and his watch was off of his wrist in close proximity to his body, indicating that a struggle had taken place before the murder. Detective Vega testified that Corceller was cut deeply and that the deep slash to his throat was “almost decapitating.”
 

 A couple of chairs were pulled out from the kitchen table, and three bottles of beer and a chewed cigar were found on the table. The front window of the living room was not secured, the screen was damaged, the blinds were in disarray, and the lock for the window was on the floor. A large knife was missing from the butcher block containing cutlery on the kitchen counter. Also, a gun case and bullets were found, but the gun was not in its case. The missing knife and gun could not be located inside Corceller’s apartment.
 

 Deputy Chester Kowalski (“Deputy Kowalski”) also participated in the investigation of Corceller’s death. He was on another call when he heard the call involving the death at the apartment complex. He recognized the address because he lived in the complex and did security work there. Deputy Kowalski went to the scene and was able to provide information to the investigating officers. The |4deputy had known Corceller since about 2002. He knew that Susan Rodriguez (“Ms. Rodriguez”) was living with him in his apartment until shortly before the murder. He stated that, on February 22, 2007, Corcel-ler kicked Ms. Rodriguez out of his apartment because he believed she was stealing from him. Thereafter, Deputy Kowalski had seen Ms. Rodriguez with Cochran. Deputy Kowalski also knew Cochran, who lived across the street from Corceller. Deputy Kowalski told the officers that he believed Ms. Rodriguez was at Cochran’s apartment because he had previously observed her in the company of Cochran.
 

 Deputy Kowalski went to Cochran’s apartment and knocked on the door. Deputy Kowalski observed the curtain moving and someone peeking out of a window at Cochran’s apartment. After Cochran opened the door, Deputy Kowalski asked for Ms. Rodriguez. Cochran pointed to the back bedroom, and Deputy Kowalski found Ms. Rodriguez hiding in a closet in the bedroom. Thereafter, Cochran consented to a search of his apartment; how
 
 *501
 
 ever, nothing of evidentiary value was discovered.
 

 Ms. Rodriguez gave a taped statement to the police in which she said that she had been living with Corceller in his apartment. Corceller was an ex-marine and currently self-employed as a private investigator. The name of his company was Statewide Investigations. Ms. Rodriguez said that, on Thursday, February 22, 2007, she and Corceller had an argument and he asked her to leave. She explained that they argued about her taking his prescribed Xanax. She said he was taking too many pills so she left him some and flushed the rest down the toilet. Corceller became hysterical and called the police, who made her leave the apartment.
 

 About that time, Cochran, who lived across the street, was outside smoking a cigarette. He came over and offered her a place to stay for the night. Although | sMs. Rodriguez did not know Cochran, she accepted the offer. This happened in the early afternoon.
 

 Ms. Rodriguez stated that she went to Piccadilly and then to a grocery store to buy beer with Corceller. When they returned back to the apartment, Corceller told her she could stay with him because he did not trust Cochran. However, Ms. Rodriguez was afraid to be arrested for trespassing after the incident earlier, so she went back to Cochran’s apartment. According to Ms. Rodriguez, Corceller told her to return the next night, but she was sick. She woke up on Friday between 10:00 or 11:00 a.m. She said she stayed in bed all day on Friday because she was not feeling well, and she did not attempt to contact Corceller.
 

 Ms. Rodriguez stated that Cochran used crack cocaine. She said that, when he ran out of crack, he asked her if Corceller had money. Ms. Rodriguez said that Corceller and Cochran knew each other, and Cochran told her he was going to borrow some money from Corceller. Ms. Rodriguez said that Cochran told her not to open the door and that he was leaving. According to Ms. Rodriguez’s statement, that occurred about 10:00 or 10:30 p.m. on Friday night.
 

 She woke up on Saturday to find that Cochran was back. She said he was sleeping, and she noticed he now had on a Saints shirt that he was not wearing when he went out the night before. She went back to bed and then Cochran woke her up to leave about 1:30 p.m. Ms. Rodriguez noticed that Cochran had Corceller’s business cell phone. She knew the phone was Corceller’s phone because it said “Statewide.” When she questioned Cochran about the phone, he told her it was not Corceller’s phone and to go back in the room and “shut up.” She also said that Cochran told her sarcastically that he had a new knife.
 

 Ms. Rodriguez stated that she went to Corceller’s apartment around 2:30 p.m. and was banging on the door. She said that his car was there, and his ^newspaper was still hanging on his door. She looked inside the apartment, but did not see anyone. Cochran called her back, and she told him she thought something was wrong. Cochran asked her if Corceller was sick, and she answered no. Cochran told Ms. Rodriguez that Corceller was probably “lying there dead” so she could stay with him one more night. Cochran also referred to Corceller as an old “[s]tu-pid cop, detective.” Ms. Rodriguez said she tried to call Corceller, but he did not answer. She said that, when the police arrived at Cochran’s apartment, she went into the closet, not knowing it was the police.
 

 Ms. Rodriguez gave similar testimony at trial. She elaborated on Corceller’s life
 
 *502
 
 style. She described him as a very fastidious housekeeper who always kept everything clean, neat, and in its place. She testified that the scene she saw through the window on Saturday — beer bottles left on the table, an unmade bed, and blinds in disarray — caused her great concern for his wellbeing.
 

 Cochran signed a waiver of rights form and gave a statement to Detective Vega. In the statement, he said that he met Ms. Rodriguez on Thursday or Friday when he was smoking a cigarette at his kitchen table. He had left the door open because he did not have electricity. He said she was crying because she had been kicked out of Corceller’s apartment. Cochran allowed Ms. Rodriguez to stay one night with him because she did not have a place to go. Cochran stated that he met Corcel-ler when he went to help Ms. Rodriguez carry her clothes, but he denied ever returning to Corceller’s apartment. Cochran also denied killing Corceller.
 

 Based on the investigation, Cochran was arrested. When the story of the arrest, including a photo of Cochran was aired on the news, Mr. Keith Tullos (“Mr. Tullos”), an independent contractor who delivers newspapers for the
 
 Times-Picayune,
 
 called the police to report he may have information about the crime. Mr. Tullos recognized Cochran and knew the apartment complex well because he |7delivers papers there. At trial he testified that he delivered papers to Riverside Apartment Complex daily and was very familiar with the complex. He explained that he was delivering papers at the complex on Friday morning, February 23, 2007. At approximately 5:00 a.m., Mr. Tullos was walking and, although usually no one was around at that time, he encountered an individual walking toward him. Mr. Tullos testified that he continued delivering papers and, as he rounded the corner, he heard a loud sound. He explained that it sounded like metal hitting concrete. He delivered another paper, and then he walked into an alley. In the alley, he encountered the same individual wearing a Saints shirt that he had seen earlier. The individual was stooped down in front of a cable box with both of his hands on the cable box. The individual then stood up and went to the corner of the building. Mr. Tullos continued past him again and then continued delivering his papers. Mr. Tullos testified that he saw the same man about three more times.
 

 Mr. Tullos testified that on Friday he did not notice anything out of the ordinary at Corceller’s apartment and that he left the paper hanging on the doorknob. He testified that, on Saturday morning, he noticed something different with Corcel-ler’s shades. The shades were never open when Mr. Tullos delivered papers to this apartment, but they were open on Saturday. Further, the blinds were bent and the lights were on. On Sunday, when Mr. Tullos delivered the paper, he noticed that the Saturday paper was still hanging on the door, which was unusual. Mr. Tullos testified that, when he went on Monday, he saw crime scene tape around Corceller’s front door. At that point, Mr. Tullos did not know about the murder.
 

 Later that day, Mr. Tullos recognized the apartment when it was shown on television. Mr. Tullos testified that he realized that something happened in that apartment and believed he had seen someone acting suspiciously, so he | Rimmediately tried to contact the homicide division. Mr. Tullos testified that later, when he was watching the news, he learned that a man had been arrested and he saw Cochran’s photograph. He realized that it was the same person he had encountered on Friday morning. Again, Mr. Tullos called the homicide division.
 

 
 *503
 
 Mr. Tullos testified that on Tuesday he delivered papers at the complex. He recalled that the Tuesday newspaper contained the story, along with Cochran’s photograph. Because he had not heard from the police, Mr. Tullos decided to go and look into the cable box himself. Mr. Tullos explained that there was a crack in the cable box because it had not been fully closed. When Mr. Tullos peeked in, he immediately saw the butt of a gun. Mr. Tullos went back to the parking lot and called 911. The officers arrived, interviewed him, and requested that he sign the newspaper to reflect that he had identified Cochran in the photograph.
 

 Detective Jeffery Rodrigue (“Detective Rodrigue”) of the Jefferson Parish Homicide Section was the case detective in this matter and assumed responsibility for the follow-up investigation. He explained that, a few days into the investigation, they received a telephone call from Mr. Tullos who had seen Cochran’s photograph on a TV News re-broadcast. Mr. Tullos had seen Cochran acting suspiciously, checked the area, and found something he believed to be of evidentiary value. Mr. Tullos pointed them to a cable box. Corceller’s loaded Glock handgun, his wallet containing his driver’s license, and his cell phone were found in the cable box. Detective Rodrigue testified that they looked for the missing knife from the butcher block but never located this weapon. Based on the investigation, Detective Rodrigue believed that Corceller was attacked on Thursday night or Friday morning after Ms. Rodriguez left him and before Mr. Tullos saw the defendant at 5:00 a.m.
 

 | sForensic experts testified that Corcel-ler suffered a wide incision across the front on both the right and left sides of his neck. There was a stab wound on the right side of the neck that was continuous with the incised wound across the neck. The stab wound began on the right side of the neck and continued across to the left side of the neck. The wound was three and one-half inches deep and nine inches long across his throat. The evidence showed that this was a homicide and that the cause of Corceller’s death was a sharp force injury of the neck.
 

 LAW AND ANALYSIS
 

 In his only assignment of error, Cochran argues that the evidence is insufficient to support the conviction. Specifically, he argues that there was no physical evidence linking him to the murder and that the evidence in this circumstantial case was insufficient to support his conviction. He argues that numerous things were wrong with the investigation and suggests that other individuals should have been investigated. Further, he suggests that there were uncertainties as to the time of Corceller’s death and attacks the credibility of Ms. Rodriguez. Cochran also argues that he had no motive to kill Cor-celler and that it made no sense to brutally kill a stranger, when the stranger was a private investigator known to carry a gun.
 

 The State responds that it presented sufficient evidence to convict Cochran of second degree murder. It contends that circumstantial evidence is sufficient to convict a defendant when every reasonable hypothesis of innocence is excluded. It also responds that the jury found the State’s witnesses more credible. It concludes that a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found Cochran guilty of second degree murder beyond a reasonable doubt.
 

 | inThe constitutional standard for testing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond
 
 *504
 
 a reasonable doubt.
 
 [1]
 
 Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 [2]
 
 Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.
 
 [3]
 
 The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
 
 [4]
 

 On appeal, the reviewing court does not determine if another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Instead, the appellate court must evaluate the evidence in a light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 [5]
 
 The reviewing court must not impinge on the jury’s finding of fact, in a criminal case, except to the extent necessary to guarantee constitutional due process.
 
 [6]
 

 Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm.
 
 [7]
 
 In _[iladdition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant’s identity as the perpetrator.
 
 [8]
 
 In the present case, according to the jury instructions, it appears that the State prosecuted this case under both theories of murder: specific intent murder and murder while committing or attempting to commit aggravated burglary.
 

 Under the first theory of second degree murder, the State must prove that defendant had the specific intent to kill or to inflict great bodily harm. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
 
 [9]
 
 The determination of specific intent is a question of fact. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries.
 
 [10]
 

 The State proved that there was a killing of a human being. Detective Vega
 
 *505
 
 testified that the coroner’s office turned Corceller over from the semi-facedown position to his back and when they rolled him over “his head like to come off. He was cut deeply.” Because of this, Detective Vega believed Corceller could not have done this to himself. Dr. Karen Ross (“Dr. Ross”) confirmed this was a homicide. She determined that the cause of his death was a sharp force injury of his neck.
 

 Although Cochran denied committing the murder in his statement, we find the State produced sufficient testimony for the jury to conclude that Cochran was the person who killed Corceller.
 

 hgCochran argues that there was no physical evidence finking him to the murder. His apartment was searched and nothing of evidentiary value was seized. Also, there was no fingerprint or DNA evidence connecting him to the murder. Aischa Simon Prudhomme, an expert in the field of latent fingerprint analysis, testified that none of the prints obtained matched Cochran’s prints. She explained that there was only one fingerprint that was suitable for comparison, and it matched Corceller’s fingerprint. There was an attempt to process other fingerprints from other items, including the Glock pistol, the cell phone, beer bottles, a wallet, and a package of cigarettes. However, the prints were not successfully processed, and there were no usable prints to analyze.
 

 Bonnie Dubourg, an expert in the field of forensic DNA testing, conducted DNA testing on various items of evidence in this case. She received reference samples from Corceller, Cochran, and Ms. Rodriguez. The blood in the bathroom was tested, and the samples were consistent with the reference blood stain of Corceller. Ms. Rodriguez could not be excluded as a donor from the window screen from the living room window. Cochran was excluded as being the donor on all the items tested.
 

 The lack of direct, physical evidence notwithstanding, the State presented circumstantial sufficient evidence to prove that Cochran was the person who killed Corcel-ler.
 

 Detective Rodrigue believed that this was a surprise attack. Detective Rodrigue and Detective Vega believed that Corceller was urinating when he was attacked from behind. Dr. Ross agreed that the investigative information showed he was standing in the bathroom at the toilet. She believed from the way Corceller collapsed on the right side and from the wound, that he was facing the toilet. The stab wound was on the right side of the neck, and would have been inflicted by | ^someone coming from behind him and cutting across his neck. She also testified that the lack of defensive wounds was consistent with a surprise attack.
 

 Dr. Ross believed that the killer would have probably at least been comparable in size to Corceller. Dr. Ross also testified that she believed the person who inflicted this wound was a left-handed person. Cochran signed the rights of arrestee/sus-pects form in Detective Vega’s presence. Detective Vega testified that Cochran was left-handed.
 

 Cochran appears to suggest that the State’s expert stated that a person did not have to be left-handed to commit this murder but only had to have used his left hand. Dr. Ross testified that the person inflicted the wound from right to left and that she believed the killer used their left hand to inflict the wound. She explained that she thought it would be unlikely that a right-handed person could have done this, and stated that she was right-handed and did not believe she could have inflicted such a wound. She believed the wound
 
 *506
 
 was inflicted by someone accustomed to using his left hand.
 

 Further, the State presented testimony that Cochran was seen in close proximity with items belonging to Corceller. Mr. Tullos testified that, on Friday, February 23, 2007, at approximately 5:00 a.m., he saw Cochran several times. He testified that, shortly after he heard a loud sound, he walked into an alley and observed Cochran stooping down in front of a cable box with both of his hands on the box.
 

 Mr. Tullos’ testimony regarding his knowledge of Corceller’s habits, his observations while delivering the paper on Sunday and Monday, combined with his testimony of his reports to police, adds to the evidence presented by the State. Additionally, the items that were believed to be missing from Corceller’s apartment were recovered in the cable box that was pointed out by Mr. Tullos. 114Petective Ro-drigue testified that Corceller’s loaded Glock handgun, his wallet, and his cell phone were recovered from inside of the cable box. According to Detective Ro-drigue, Corceller and Cochran lived on opposite sides of the street, and the cable box was on defendant’s side of the street.
 

 The State presented Ms. Rodriguez’s statement and testimony as evidence that Cochran was the person who committed this murder. However, Cochran attacks the credibility of Ms. Rodriguez. He claims she was a notorious liar, a thief, and a suspected drug user, who lied about her criminal history. He also argues that Mr. Tullos’ testimony contradicted Ms. Rodriguez’s testimony when he said he did not see anything unusual with Corceller’s apartment on Saturday morning. However, the transcript belies that assertion. It is clear that Mr. Tullos said he
 
 did
 
 believe things seemed unusual at Corceller’s apartment on Saturday morning.
 

 Ms. Rodriguez testified that she was previously convicted of criminal activity. She stated that she had been convicted of obtaining Hydrocodone by fraud and deceit as well as a misdemeanor theft. She admitted that she had pending misdemean- or theft charges and was on inactive probation for theft. Ms. Rodriguez testified that she was arrested for shoplifting twice a couple of weeks prior to the murder. She explained that these were the charges open at the time of trial. On cross-examination, she was questioned about her convictions. Ms. Rodriguez testified that, after the murder, she moved in with Calvin Milto. She admitted that she was on probation at the time of the trial for theft from Calvin Milto’s house. On re-direct, Ms. Rodriguez testified that she only had knowledge of two prior convictions, and was never convicted as being a multiple offender. She denies an adjudication as a multiple offender.
 

 hsCochran argues that Ms. Rodriguez lied about her criminal history; however, on re-direct she confirmed that she only had knowledge of two prior convictions. Further, at one point during cross-examination, it appeared she was confused, stating, “I pled guilty, but I was not convicted.”
 

 Cochran also challenges Ms. Rodriguez’s credibility based on discrepancies regarding the suspected time of Corceller’s death. We do not find serious discrepancies on that issue sufficient to give merit to this argument. Further, much of Ms. Rodriguez’s testimony was corroborated by that of Mr. Tullos. He stated that he saw the suspicious individual later identified as Cochran wearing a Saints shirt on Friday morning at approximately 5:00 a.m. stooping by the cable box. He said that it was not until Saturday morning that he noticed something that was unusual with Corceller’s apartment. He testified that
 
 *507
 
 the shades were open, the blinds were bent, and the lights were on. He noticed on Sunday that the Saturday paper was still hanging on the door.
 

 Timothy G. Lynch, Corceller’s cousin, also testified that on Sunday when they went to Corceller’s apartment to check on him, he noticed there were two newspapers hanging on the door. He also confirmed other testimony concerning the fastidious and predictable habits of Corceller.
 

 Dr. Ross explained that the autopsy report reflected the time of death was at 8:20 p.m. on February 25, 2007, but this may have been when the body was found or the victim was pronounced dead, not the actual time of death, which is difficult to determine and not accurate to determine within closer than 24 to 48 hours.
 

 Evidence presented at trial shows that Thursday night was the last night that anyone saw or spoke with Corceller. Then, his body was found on Sunday night. Although the time of death is unknown, we do not find that knowledge of the exact time of death would necessarily exclude Cochran as the killer in this case.
 

 110Given the verdict, it is clear that the jury found the State’s witnesses credible. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal.
 
 [11]
 

 Cochran also argues he did not have motive to kill Corceller. Cochran points out that he was getting an insurance settlement and did not need money. He also appears to argue that it would not be reasonable to think that he would brutally kill a stranger, when the stranger was a private investigator known to carry a gun.
 

 To support this argument, the defense offered the testimony of Alfred C. Barrera (“Mr. Barrera”), Cochran’s attorney in a civil matter involving a car accident. Mr. Barrera testified that the civil matter was resolved the first week of February 2007. He testified that the case had been settled at the time of the murder, and Cochran knew the amount of money he would receive. Although Mr. Barrera testified that Cochran received $46,289.12, it appears Mr. Barrera was authorized to open a bank account for the money because Cochran was incarcerated at the time. Thus, Cochran did not have access to this money at the time of the murder.
 

 The State presented testimony that Cochran’s apartment did not have electricity. The power was cut off by the condominium association because he failed to pay money owed. Ms. Rodriguez testified when she asked Cochran how he made money he said he “hustles.”
 

 Cochran also argues that other individuals should have been investigated regarding this murder, including Michael Si-moneaux (“Mr. Simoneaux”), who had an altercation with Corceller; Cochran’s roommate, Daniel; and Ms. Rodriguez’s 117ex-husband, Robert Rodriguez (“Mr. Rodriguez”). In Cochran’s statement, he said that Mr. Rodriguez told his ex-wife that he would kill Corceller after becoming angry about money issues. However, Cochran admitted in his statement that Mr. Rodriguez was handicapped and could not even get out of his vehicle when Cochran invited him inside. Detective Rodrigue testified that Mr. Rodriguez was never developed as a suspect in the investigation. Detective Rodrigue also testi
 
 *508
 
 fied that they did not interview Daniel, the person Cochran indicated was his roommate.
 

 The defense argues that Mr. Simoneaux should have been considered a suspect because he previously had an altercation with Corceller. Deputy Kowalski testified that he investigated an incident that occurred on May 19, 2006 between Mr. Simoneaux and Corceller. On that day, Corceller flagged Deputy Kowalski down because he believed Mr. Simoneaux had cut his car tire. Deputy Kowalski believed that Ms. Rodriguez was Mr. Simoneaux’s girlfriend at the time, but had been “keeping company” with Corceller. Deputy Kowalski testified that Corceller went to Mr. Simo-neaux’s apartment, which was nearby in the same complex, to confront him. He believed Mr. Simoneaux had pushed Cor-celler down twice, cutting his lip. Corcel-ler admitted that he went to Mr. Simo-neaux’s apartment with a gun on the day of that incident. Deputy Kowalski testified that Corceller was a private investigator and licensed to carry a gun. According to Deputy Kowalski, at the time of Corceller’s death, Mr. Simoneaux was gone. Deputy Kowalski explained that about two weeks after this incident, Mr. Simoneaux was evicted, and he never saw him again. Deputy Kowalski testified that he had no reason to believe that Mr. Simo-neaux was anywhere near the apartment complex in February of 2007.
 

 11sCochran argues that the murder investigation was flawed because the homicide division did not return Mr. Tullos’ calls and the detectives failed to interview other individuals. We do not find this argument convincing since the investigation led to sufficient evidence linking Cochran to the murder.
 

 We find that the evidence presented in this case was constitutionally sufficient to support the jury’s finding that Cochran had the specific intent to kill or inflict great bodily harm to Corceller. This specific intent could be inferred from the circumstances and the extent and severity of the victim’s injuries.
 
 [12]
 

 Specific intent to kill can be implied by the intentional use of a deadly weapon such as a knife or a gun.
 
 [13]
 
 Corcel-ler was killed by a knife wound to the throat. He had a butcher block in his kitchen from which the large butcher knife was missing and never located.
 

 The State presented testimony as to the extent and severity of Corceller’s injury. Detective Vega testified that the deep slash to his throat was “almost decapitating.” Dr. Ross testified that Corceller had a wide incision across the front on both the right and left sides of his neck. She testified that the wound was three and one-half inches deep on the left side of the neck and that it went through the carotid artery and the jugular vein and separated the hyoid bone, a u-shaped bone that sits at the base of the tongue on top of the voice box. It separated that from the voice box and went into the soft tissue that sits on top of the front of the spine in back of the neck. She testified that, because the wound went through to the spine, all of the soft tissue and the ligaments in the front of the neck were cut into two. She agreed that such a wound could nearly decapitate someone. That evidence is Insufficient to show the specific intent to ldll necessary for a conviction of second degree murder.
 

 After viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reason
 
 *509
 
 able doubt that the evidence was sufficient to support Cochran’s second degree murder conviction. We find no merit in this argument. Accordingly, Cochran’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 .
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 [2]
 

 .
 
 State v. Harrell,
 
 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
 

 [3]
 

 .
 
 State v. Kempton,
 
 01-572, p. 7 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722.
 

 [4]
 

 . La. R.S. 15:438.
 

 [5]
 

 .
 
 State v. Durand,
 
 07-4 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034,
 
 writ denied,
 
 07-1545 (La.1/25/08), 973 So.2d 753.
 

 [6]
 

 .
 
 State v. Mitchell,
 
 99-3342 (La.10/17/00), 772 So.2d 78, 83.
 

 [7]
 

 . La. R.S. 14:30.1;
 
 See also, State v. Lewis,
 
 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90,
 
 writ denied,
 
 06-0757 (La.12/15/06), 944 So.2d 1277.
 

 [8]
 

 .
 
 See, State v. Draughn,
 
 05-1825 (La.1/17/07), 950 So.2d 583, 593,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 

 [9]
 

 . La. R.S. 14:10(1).
 

 [10]
 

 .
 
 State v. Durand,
 
 963 So.2d at 1034.
 

 [11]
 

 .
 
 State v. Rowan,
 
 97-21 (La.App. 5 Cir.
 
 4/29/91),
 
 694 So.2d 1052, 1056.
 
 See also, State v. Macon,
 
 06-481 (La.6/1/07), 957 So.2d 1280, 1286 (where the court recognized it is not an appellate court's function to assess credibility or re-weigh the evidence).
 

 [12]
 

 .
 
 See, Durand, supra.
 

 [13]
 

 .
 
 State v. Templet,
 
 05-2623 (La.App.
 
 1
 
 Cir. 8/16/06), 943 So.2d 412, 421,
 
 writ denied,
 
 06-2203 (La.4/20/07), 954 So.2d 158.