ROBERT M. MURPHY, Judge.
| aDefendant, Antoine Johnson, appeals his conviction for second degree murder. For the reasons that follow, we affirm defendant’s conviction and sentence.

STATEMENT OF THE CASE

On September 12, 2013, a Jefferson Parish Grand Jury indicted defendant, Antoine Johnson, A.K.A. “Twan,” with.the second degree murder of Aaron Roby, in violation of La. R.S. 14:30.1. Defendant pled not guilty at his arraignment, and filed various pre-trial motions, all of which were withdrawn on August 13, 2014. On May 19, 2015, pursuant to La. C.E. art. 404(B), the State filed a notice of intent to use evidence of other crimes and notice of intent to use confession or statement pursuant to La.C.Cr.P. art. 768. The trial court granted the- motions over defense objections. ■ ; .
On Máy 20, 21, and 22, 2015, the case was tried before a twelve-person jury that found defendant guilty as charged. . On June 3, 2015, defendant’s motion for a new trial and motion .for post-verdict judgment of acquittal were both heard and denied. That same day, the trial judge sentenced defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. On June 4, 2015, defendant filed a motion to reconsider sentence, which was denied. The instant appeal follows.

JREACTS

Sabrina Johnson, defendant’s girlfriend, testified that around April 2013, she had “on and off relationship” with defendant, who she had known for approximately eight years. She also knew the victim, Aaron Roby, who lived across the hallway from her in the same apartment complex, and with whom she worked at the naval base in Belle Chasse. On the night of April 21, 2013, after Roby’s body was found shot multiple times at the back of the apartment complex where they both lived, police took Ms. Johnson’s statement. She recounted for police an argument she and defendant had two weeks prior, which resulted in an altercation that became “pretty loud.” During the argument, Roby came to Johnson’s apartment and told her and defendant to be quiet.
With regard to the events that occurred on the date of Roby’s murder, Johnson testified that she, defendant, and her two children were in defendant’s car, a white Infinity, on their way to Golden Corral restaurant that evening, She and defendant argued after defendant “said something to [her] son.” Johnson testified that she told defendant, in summary, that because he had not stood up to Roby two weeks before, that defendant could not now correct her child. She stated that defendant did not seem angered by her comment, but was quiet instead. Defendant did not drive to Golden Corral, but instead brought Johnson and her children to get fast food. Later, after visiting his cousin’s house for approximately 30 minutes, defendant brought Johnson to her apartment and left shortly thereafter. Also on the night of the murder, unsure whether defendant had already left the apartment complex, Johnson called defendant and asked him to take her to the store. Defendant responded' that he would, "but that he was talking to her “neighbor.”[1] Johnson testified that she then began to walk out of her apartment when a dog 14,jumped on her. At that time, *383 she also heard loud gunshots. Johnson hid with her children under a sink, then called defendant again “to make sure he was all right.” Defendant answered, and told Johnson “don’t call him- no more.” Later that night, Johnson identified defendant in a photographic lineup, but testified that she did not implicate him or say she saw him shoot Roby. Johnson denied telling any police officer that she saw the victim and defendant talking the night of the murder.
Felicia Moody, who also lived in the same complex as Johnson, testified about the altercation that had occurred two weeks prior to the murder between defendant, who is her nephew, and Johnson. Moody recalled that at approximately- 2:00 a.m. on the night of the altercation, which was two weeks before the murder, she answered a call from Roby on her daughter’s phone. Roby told Moody that her “people out here getting in trouble,” meaning her nephew, the defendant, and that he had called her instead of the police to “get it under control” over at Johnson’s apartment. Moody went to Johnson’s in an attempt to end the altercation. While Moody was there, Roby calmly went to Johnson’s apartment for a second time with a request for them to keep the noise down because he was trying to sleep. In response, defendant yelled.at Roby, stating, “you need to stay out of my f* * * * *g business,” R0by replied that if he “was in [defendant’s] business,” he would have called the police instead of defendant’s family. After Roby left, Johnson and , defendant stopped arguing. Moody testified that the morning after the altercation, defendant came to her apartment, asking if she knew when the victim was going to work, stating that he was “going to get that n* *. * *r.”
Moody testified regarding the shooting of Roby on April 21, 2013. She stated that after- she heard gunshots, defendant knocked on her door. Moody questioned him about his involvement with the shooting, asking “What you done did?” Defendant responded, “that n* * ⅜ *r done for. He going to meet his | (¡maker ... Aaron ... ain’t getting up no more.” Moody stated that she saw defendant with a gun, which he wanted to throw in her toilet. She told him “lead don’t flush” and that he could not put the ■ gun on her patio. Moody then told defendant to leave and to “get across the' river” because “JP was coming, Gretna was coming,” at which time she saw defendant get into his white car and leave.
Latara Walker, Felicia Moody’s daughter, also testified regarding the events of April 21, 2013. She knew Roby as both a co-worker and her friend. On April 21, 2013, Moody called Walker, asking her to come over to her apartment. When Walker arrived, Moody was not there, so she went to Roby’s apartment. When Roby did not answer the door, Walker entered the apartment but did not see anything. As she was leaving, Walker was approached by police, who had arrived on the scene, and she ultimately identified Roby qs the victim of the shooting. She testified that at that point she told the police that “my cousin did that, Antoine Johnson. That’s who did that.” Later in the evening, she went to Johnson’s apartment. When Walker asked Johnson where defendant was, Johnson’s two children pointed in the direction of the victim’s apartment.
Walker further, testified that she talked to Johnson the day after the-victim was murdered. Johnson[5] told her that she saw defendant shoot Roby. Walker stated that Johnson told her that as she was walking out of her apartment, a dog came near her and Roby told her that he was going to hold the dog. As he bent-over to do so, defendant shot Roby in the head...
*384 Detective Rhonda Goff of the Jefferson Parish Sheriffs Office testified that she was the lead detective in the homicide investigation of Aaron Roby. On April 21, 2018, she was called to the scene at 250 Holmes Boulevard. Detective Goff viewed the body of the victim, who was found in the back of the apartments in the grassy area. Patrol officers informed Detective Goff that “someone , had come ^forward” and “given them the name of Antoine Johnson as a possible-suspect.” Detective Goff talked with Sabrina Johnson, and later, she used defendant’s phone records to confirm the two calls placed to defendant that Johnson told her about. She also described using cell towers to determine defendant’s location before,' during, and after the murder. The first' call used a tower in Terrytown, approximately 1.67 miles from the location of the murder, and the call after the murder used a tower in the “Fischer projects neighborhood” on Thayer Street.
Detective Goff explained that the patrol officers who were first on the scene on Roby’s murder were called by a “Shotspot-ter call” which alerted the officers that there were gunshots in the'area at 9:56 p.m. Detective Goff explained that the “Shotspotter” is a device that was installed in some “bad neighborhoods” on the west bank of Jefferson Parish.' It alerts dispatch and officers in the area when it detects a sound that is similar to a gunshot and pinpoints the location of the gunshots and records how many. Defendant’s phone records indicate that Johnson called defendant again at 10:00 p.m., which corresponded to the call in which Johnson asked about defendant’s well-being,- and he told her nob to call him anymore. A few days after the murder, police found defendant’s car, a white Infinity, parked at defendant’s cousin, Coy -Moore’s, apartment. ■ When questioned about the car and defendant’s whereabouts, Moore responded that he had not seen defendant in over a month, and the car had been “broke down and parked there for over a month.” Detective Goff suspected Mr. Moore was lying because of Ms. Johnson’s statement that she and defendant.went to Mr. Moore’s apartment on April 21, 2013, in defendant’s white Infinity. Defendant was. ultimately arrested in San Antonio, Texas, by. U.S. Marshals on May 17,2013.
Deputy Johnnie Petit also testified regarding the investigation of the April 21, 2013 murder. Deputy Petit testified that he and his sergeant were about a block |7away from 250 Holmes Boulevard on the night of April 21, 2013,: investigating a noise ordinance violation, when he heard gunshots and got “the call” over the radio. After he finished securing the scene, Deputy Petit talked'with Johnson; She told him that after returning her to her home, defendant went to the back of the apartment complex, and she saw defendant talking to'the victim. 1
Dr. Susan Garcia, a forensic pathqlogist with the Jefferson Parish Forensic Center, conducted the autopsy of'’Aaron Roby. She testified that the manner of death in the case was homicide; the victim sustained multiple distant range gunshot wounds and one intermediate range gunshot wound. Dr. Garcia testified that the victim sustained at least thirteen gunshot wounds, with two of the gunshot wounds being “definitely lethal.”

LAW AND ANALYSIS ' ,,

Sufficiency of Evidence
In his second assignment of error, defendant challenges the sufficiency of the evidence.' When the issues on appeal relate to both the Sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the appellate *385 court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Accordingly, we will address this claim first.
Defendant contends that the evidence was insufficient to support his conviction because the State did not put forth any physical evidence that linked him to the murder. He avers that the “hearsay testimony” given by Latara Walker and her mother, Felicia Moody, which connected defendant to the murder, was unreliable because both' made contradicting statements. Defendant further argues |sthat the evidence presented did not eliminate all reasonable hypothesis of innocent activity. ■ ' •
Conversely, the State argues that it proved' beyond a reasonable doubt through testimonial and physical evidence that the defendant shot and killed the victim. The State also- asserts that after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
The standard of review for determining the sufficiency of the evidence is whether after viewing the evidence -in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Both direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02); 811 So.2d 1015, 1019.
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude,' according to reason and common experience, the existence.-of other connected facts. State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01); 806 So.2d 718, 722. The rule as to circumstantial evidence is “assuming every fact to be proved that the evidence tends to prove, in order to -convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events.' Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83.
RUnder the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence, at trial established guilt beyond a reasonable doubt, but rather whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in. the light most favorable to the prosecution. State v. Flores, 10-651 (La.App. 5 Cir. 5/24/11); 66 So.3d 1118, 1122. When addressing the sufficiency of- the evidence, consideration must be given to the entirety of the evidence, both admissible and inadmissible, to determine whether the, evidence is sufficient to support the conviction. State v. Hearold, 603 So.2d 731, 734 (La.1992).
Defendant was convicted of second degree murder of Aaron Roby. La. R.S. 14:30.1 provides that second degree murder is the killing óf a human being when the offender has specific intent to kill or to inflict great bodily harm. Specific criminal intent is “that state of mind which exists when . the circumstances indicate that the offender actively desired the pre *386 scribed criminal consequences to follow his act or failure to act.” State v. Holmes, 12-579 (La.App. 5 Cir. 5/16/13); 119 So.3d 181, 191. Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the defendant’s conduct. Id. In addition to proving each statutory element of the crime charged, the State must also prove the identity of the perpetrator. State v. Williams, 08-272, p. 4 (La.App. 5 Cir. 12/16/08); 3 So.3d 526, 529, writ denied, 09-0143 (La.10/16/09); 19 So.3d 470.
In the instant case, the physical evidence recovered from the crime scene did not directly implicate defendant. Evidence and testimony at trial, however, gave the jury a basis for finding that defendant shot and killed Roby. The State established that defendant had told others that he had a vendetta against Roby after | ipRoby had intervened in an argument between defendant and his girlfriend. On the night of Roby’s murder, Johnson antagonized defendant about him not standing up to Roby on the night of the disagreement. Although Moody, in her first statement to police, denied that she saw defendant with a gun, at trial she testified that defendant, came to her apartment soon after the shooting, asking if he could hide his gun. Defendant also told Moody that Roby was dead. Roby was found at the back of the apartment complex, and evidence from defendant’s cell phone placed him in that vicinity at the time of the shooting. Johnson initially told police that she saw defendant talking with the victim soon before his murder, but then denied at trial speaking with police. Additionally, Walker testified that Johnson told her that she saw defendant shoot the victim, although Johnson denied making the statement when she, herself, testified.
A specific intent to kill may be inferred from the intentional use of a deadly weapon such as a knife or gun. State v. Cochran, 09-85, p. 18 (La.App. 5 Cir. 6/23/09); 19 So.3d 497, 508, writ denied, 09-1742 (La.3/26/10), 29 So.3d 1249. “The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill.” State v. Gonzalez, 07-449, p. 8 (La.App. 5 Cir. 12/27/07); 975 So.2d 3, 8, writ denied, 08-228 (La.9/19/08), 992 So.2d 949.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08); 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second guess the credibility, of witnesses as. determined by the trier of fact or to reweigh the evidence. Id. Where there is 1^conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, this is a matter of the weight of the evidence, hot its sufficiency. State v. Miller, 11-498 (La.App. 5 Cir. 12/13/11); 84 So.3d 611, 617, writ denied, 12-176 (La.9/14/12); 97 So.3d 1012.
We find that the jury made a credibility determination and chose to believe Moody’s testimony, despite the inconsistencies, that defendant was Roby’s shooter. Also, the jury apparently found Johnson’s statements to police the night of the murder more credible than her recantation at trial. A review of the record reflects that the jury’s credibility determination was rational. Additionally, the cell phone tower evidence and eyewitness testimony placed defendant in the immediate vicinity of the shooting around the time of the murder on the night in question, and also *387 showed defendant leaving the scene of the murder quickly after the shooting. Defendant also left the state following the shooting and remained at large until he was apprehended by U.S. Marshals. Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier of fact may infer guilt. State v. Bellow, 08-259 (La.App. 5 Cir. 7/29/08); 993 So.2d 307, 316, writ denied, 08-2109 (La.4/13/09), 5 So.3d 162.
Thus, viewing the evidence in the light most favorable to the prosecution, we find that there was sufficient evidence upon which a rational trier of fact could have found beyond a reasonable doubt that the State proved the essential elements of second degree murder so as to support defendant’s conviction. ' This assignment of error is without merit.
Prior Bad Acts Evidence
In his first assignment of error, defendant first argues that the State’s notice of intent to use other crimes was untimely, and second that the testimony.of prior [12bad acts was used solely to portray him as a person of criminal character. Furthermore, defendant argues that any probative value of the testimony was certainly outweighed by its prejudicial effects.
Conversely, the State argues that defendant’s claim that it did not timely disclose evidence should not be considered on appeal, as it-was not first raised before the trial court.[2]. The State further contends that defendant did hot contemporaneously object at the time of the actual witness testimony. ■

Timeliness of Notice

The record shows- that the State filed its notice of intent to use evidence of other crimes the morning of May 19, 2015, prior to jury selection. - In its notice, the State set forth that at trial it would introduce evidence that “defendant committed domestic abuse battery upon Sabrina Johnson/which resulted in a verbal confrontation between defendant and the victim, Aaron Roby on or about April 7, 2013.”[3] The morning’of May 19, 2015, defense counsel objected to the State’s notice of intent, primarily arguing untimeliness, but additionally arguing that the notice was vague and it was incumbent on the State to demonstrate by clear and convincing evidence that motive is an issue at trial, thereby establishing'the relevance of the evidence.
With respect to the timeliness of the Prier[4] notice, under certain circumstances the Louisiana Supreme Court has found it permissible for the State to give notice to a defendant on the day of trial of other acts evidence it seeks toj^introduce. In State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1284, the court noted:
*388 However, the state did not file its notice of intent/to use inculpatory statements until the eve of trial. Defendant argues that the-state thus violated Prieur’s requirement that the state furnish notice “within a reasonable time before trial.” 277 So.2d at 130. However, not every violation of pre-trial procedures (including Prieur violations) requires' reversal, and before a defendant can complain of such a violation, he must show prejudice. State v. Hooks, 421 So.2d 880 (La.1982); State v. Strickland, 398 So.2d 1062 (La.1981). The record reveals that well before trial, defendant (1) had knowledge of the state’s whole file via discovery (which informed defendant of.the state’s awareness of the prior conduct .and the availability of a witness who could testify to it); (2) had knowledge of the state’s intention to use. prior, conduct at the penalty phase. This knowledge combined to give to. defendant sufficiently particular notice of the admissible other crimes evidence , in enough time to prepare a defense to it. Notably, appellate counsel does not in any event suggest how trial counsel could have defended against the evidence.
In the instant case, we find that defendant had ample notice that the • State would introduce evidence of the • incident that happened two weeks prior to the murder. The record .demonstrates that testimony regarding the confrontation was given at a pretrial hearing that perpetuated testimony for the purpose of trial; the testimony was not objected to, based on it being inadmissible evidence of bad acts. Additionally, details regarding the incident were initially given to police officers by Johnson only because they were investigating the murder. These same details were in Detective Goffs investigative report, which was turned over to defense counsel in discovery well in advance of trial. Under these facts, we do not find that defendant has demonstrated prejudice. Accordingly, we find that defendant’s claim regarding the untimeliness of the notice of intent is without merit. See State v. Ridgley, 08-675 (La.App. 5 Cir. 1/13/09) 7 So.3d 689.
j i4Independent Relevance Of The Prior Acts Evidence
Generally, evidence of other crimes or bad acts committed by a . criminal defendant is not admissible at trial. La. C.E. art. 404(B)(1); State v. Prieur, supra. However, when such evidence tends to prove a material issue and has independent relevance other than to show that the defendant is -of-bad character, it may, be admitted by certain statutory and jurisprudential exceptions to this rule. State v. Dauzart, 02-1187, p. 8 (La.App. 5 Cir. 3/25/03); 844 So.2d 169, 165. Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1);
In order for other crimes evidence to be admitted under La. C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. State v. Jackson, 625 So.2d 146, 149 (La.1993). Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403. The defendant bears the burden to-show that he was prejudiced by the admission of-the other crimes evidence. Dauzart, 02-1187 at 9, 844 So.2d at 165-66. Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence pursuant to La.- C.E. art. 404(B)(1) will not be disturbed. State v. Williams, 02-645, p. 16 (La.App. 5 Cir. 11/26/02), 833 *389 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398. In the instant case, The State asserted that evidence of the “verbal altercation providetd] the basis for defendant’s specific intent and motive to kill or cause great bodily harm to Aaron Roby.” Specific intent to kill or inflict great bodily harm is one of the elements the State needed to prove' in order to convict defendant of second degree murder. Accordingly, we find that the independent Irrelevance requirement of La. C.E. art. 404(B)(1) was met, and therefore no error in the trial court’s admission of evidence on that basis.
We further find the evidence of thé previous altercation and Roby’s intervention to be admissible as res gestae evidence. Res gestae events constituting “other crimes” are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. State v. Taylor, 01-1638, p. 10 (La.1/14/03); 838 So.2d 729, 741, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004); State v. Carter, 15-99, p. 21 (La.App. 5 Cir. 7/29/15); 171 So.3d 1265, 1280. The res gestae doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime, if a continuous chain of events is evident under the circumstances. Taylor, 01-1638 at 10-11, 838 So.2d at 741. The res gestae doctrine is designed to-allow the story of the crime to be .told in its entirety, by proving its immediate context of happenings in time and place. Taylor, 01-1638 at 10, 838 So.2d at 741.
In the instant case, testimony and evidence regarding the altercation between defendant and Johnson two weeks prior to Roby’s1'murder, during which Roby intervened, provided a narrative which explained why defendant would have a motive to kill Roby, i.e. for interfering in defendant’s personal “business.” Following the altercation, defendant told Felicia Moody that he was out to “get” Roby. On the night of Roby’s murder, Johnson antagonized defendant by stating he had not previously stood up to Roby.5 This same res gestae evidence and | ^.testimony also provided an explanation to jurors as to why defendant was developed as a suspect by police in Roby’s murder, and was therefore admissible for that purpose as well. State v. Carter, 15-99 (La.App. 5 Cir. 7/29/15), 171 So.3d 1265, 1280. In conclusion, we find no abuse of the trial court’s discretion allowing evidence of the previous altercation. This assignment of error is without merit.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals no errors patent in this case.

CONCLUSION

, Accordingly, for the foregoing reasons, we affirm defendant’s conviction and sentence. :

CONVICTION AND SENTENCE AFFIRMED.

. Johnson testified that she did not know which- “neighbor” he was talking about.

.The State specifically contends that, "Johnson argued at trial that the notice of intention to use the evidence (as opposed to untimely disclosure of the evidence itself) was untimely and that the evidence was not being introduced for a relevant purpose under Louisiana Code of Evidence Article 404.” The State is correct that defendant did not argue the alleged prejudicial nature of the Evidence before the trial court. ■-Accordingly, we will limit our review to the issues of the timeliness of the Prieur notice and the relevance of the evidence at issue.

. Attached to the-notice of intent as Exhibit A is Detective Goff's report regarding the homicide investigation of Aaron Roby. The narrative in her report reflects she spoke with Ms. Johnson the night of the murder, and Ms. Johnson told Detective Goff about the incident two weeks prior. Additionally, in the State’s notice of intent, it avers that this police report was turned over to defense counsel previously in discovery.

. State v. Prieur, 277 So.2d 126 (La.1973).

. According to the April 21, 2013 police report, Johnson called defendant a "punk” and told defendant "that the victim shut [defén-dant] down like a man, and [defendant] folded like a Bitch.”- The police report also indicated that Johnson cried during the interview, repeating "This is all my fault.”