ROBERT A. CHAISSON, Judge.
I ¡¿Defendant, Irvin Harris, appeals his convictions of second degree murder, illegal possession of a stolen firearm, and conspiracy to commit obstruction of justice. • He challenges' the sufficiency of the evidence used to convict him, as well as the admissibility of a recorded jailhouse telephone call in which he was a participant. For the reasons that follow, we affirm .his convictions and sentences for second degree murder and illegal possession of a stolen firearm;, however, we find that the State failed to produce ¡sufficient evidence at trial to sustain defendant’s conviction for conspiracy to commit obstruction of justice, and accordingly, we, reverse his conviction and vacáte his sentence on that count.

*470
PROCEDURAL HISTORY

On February 20, 2014, the Jefferson Parish Grand Jury returned an indictment charging defendant with two counts of second degree murder, in violation of La. R.S. 14:30.1 (counts one and two); one count of illegal possession of a stolen firearm, in violation of La. R.S. 14:69.1 (count three); and one count of ^conspiracy to commit obstruction of justice, in . violation of Lai R.S. 14:26 and 14:130.1 (count five).[1] At his arraignment, defendant pled not guilty.
Trial commenced before a twelve-person jury op. December 9, 2014. After considering the evidence presented, the jury, on December 11, 2014, found defendant guilty as charged on all counts. ■ Defendant filed a motion for new trial and a motion for post-verdict judgment of acquittal, which were denied on January 12, 2015. Thereafter, on January 16, 2015, the trial court sentenced defendant to the following: life imprisonment without benefit of probation, parole, or suspension of sentence on counts one and two; five years at hard labor on count three; and twenty years at hard labor on count five, to be served concurrently. Defendant now appeals.

FACTS

' This case stems from shootings that occurred shortly before midnight on August 13,2013, in the 4000 block of Paige Janette Drive in the Woodmere Subdivision in Harvey, Louisiana. When the officers arrived on the scene, they observed two victims, Nikiayh Westerfield and Dave Harrison, in a Chevy Blazer that had been parked in the back section of the high crime neighborhood. Mr. Westerfield was in the driver’s seat, and Mr. Harrison was in the passenger backseat, and they both had apparently suffered fatal gunshot wounds. Subsequent autopsies confirmed that the two men died from multiple gunshot wounds.
Detective Gary Barteet, the lead invests gator, as well as other officers, from the Jefferson Parish Sheriffs Office, surveyed the scene and recovered ballistics material, one black and red Nike sandal, and a cellular phone, which was subsequently determined to belong to defendant, from outside the vehicle. The Dofficers also obtained evidence from inside the vehicle, including ballistics material, two'guns (a Kimber .40 caliber semiautomatic firearm and a Colt .38 caliber revolver), and three cell phones. In addition, the officers found a clear bag containing marijuana in Mr. Westerfield’s hand and a wooden rosary in his lap. Further, Detective Barteet observed a blood transfer on the front passenger seat that suggested another person was in the vehicle.
Shortly after his arrival on the scene, Detective Barteet was alerted that a shooting victim had been brought to West Jefferson Hospital. Detective Tommy Gai of the Jefferson Parish Sheriffs Office proceeded to the hospital to interview the victim, Jerremy Coleman, and to determine whether there was any connection to the Woodmere shootings. Mr. Coleman told the officer that he was in the “Haydel August area” of Jefferson Parish with some friends, and an unknown individual shot him. In an effort to verify Mr. Coleman’s statement, several officers canvassed the area and checked the shot spot *471 ter system,[2] but they found no indication that a shooting had occurred in the location specified by Mr. Coleman. As part of their investigation, police obtained and reviewed the surveillance video from West Jefferson Hospital, which showed Mr. Coleman’s arrival at the emergency room in a black SUV. The video also showed two other individuals, later identified as defendant and Tavis Joseph, bringing him into the emergency room. Based on the time stamp in the surveillance video, Detective Barteet determined that they arrived at the hospital roughly eight minutes after the call was first broadcast relating to the homicides, which was an appropriate time frame for driving the distance between the Woodmere shootings and the hospital.
Thereafter, on August 15, 2013, officers stopped a GMC SUV, which had been flagged as a vehicle of interest in the investigation, and detained defendant, 15the driver of the vehicle. Sergeant Jeff Ro-drigue, a supervisor in the homicide section, arrived on the scene of the stop and observed, through the open doors of the SUV, an “obvious blood transfer” and a Nike slipper that was halfway underneath the carpet and was consistent with or nearly identical to the shoe found on the scene of the Woodmere shootings. Pursuant to the officer’s request, defendant agreed to go back to the detective’s bureau for an interview.
Once at the bureau, Sergeant Rodrigue advised defendant of his Miranda[3] rights and then questioned defendant about his whereabouts on the night of August 13, 2013.[4] According to Sergeant Rodrigue, defendant admitted that he was with Mr. Coleman in the black GMC SUV in the Woodmere Subdivision that night; however, defendant claimed that at some point, Mr. Coleman dropped him off at- his girlfriend’s house in Marrero and left. Defendant told Sergeant Rodrigue that Mr. Coleman’s vehicle returned a short time later with Tavis Joseph, who informed him that Mr. Coleman' had been shot. Defendant then got into the car to go drop- Mr. Coleman off at the hospital. When Sergeant Rodrigue questioned defendant about his cell phone being oh the murder scene; defendant first explained that he lost his phone that night and then said he must have left it' with Mr. Coleman in the SUV. At that point, Sergeant Rodrigue left the interview room to take a phone call from Detective Barteet. As Sergeant Ro-drigue walked into his office, defendant ran down the hallway and fled the building through the back door, leaving behind the cell phone that he had in his possession that night. The officers later discovered that the cell phone belonged to Mr. Colé-man.
On the following day, defendant was located and arrested pursuant to a warrant. Subsequent to .his arrest, defendant agreed to give a verbal statement, to Detective Barteet. Prior to this statement, defendant was advised of his . rights and vindicated that he understood and wished to waive those rights. During his conversation with- Detective Barteet, defendant acknowledged that on the night of the shootings, he was with Mr. Coleman in Mr. Coleman’s vehicle. However, -when Mr. Coleman decided to go purchase some marijuana, defendant had Mr. Coleman *472 drop him off at his girlfriend’s residence on Rue Racine in Marrero. Defendant claimed that he left his phone in Mr. Coleman’s vehicle to secure uninterrupted time with Kieijra Jacks, his girlfriend. According to- defendant,- he learned a short time later that Mr. Coleman had been shot, and he then traveled with Mr, Joseph to the area discovering Mr. Coleman behind the wheel of his vehicle. Defendant also indicated. that Mr. Coleman was operating the vehicle, which based on Detective Barteet’s knowledge of Mr. Coleman’s condition from being shot, was physically impossible. Detective .Barteet .thereafter interviewed Ms. Jacks , to verify defendant’s- alibi. However, neither she nor any other person indicated that defendant was at her house on the night of the shootings.
⅛ the present case, there were no, eyewitnesses to the shootings. , As a result, law enforcement officers relied on the information obtained from the recovered cell phones and, .the analysis of the physical evidence to assist in their investigation of the case. Based on the information obtained from the relevant phone calls and text messages from the recovered phones, Detective Barteet determined that Mr. Coleman planned to purchase some marijuana from Mr. Westerfield and that the parties corresponded about a price and a meeting place. Further, the text messages and phone calls between Mr. Wes-terfield and Mr. Coleman established that they were communicating in the half hour or so leading up to the shooting; In addition to phone calls .and text messages, photographs and videos were recovered from the phones. Some of the photographs depicted Mr. Coleman wearing a rosary that appears to be the same rosary that was found in the car on one of the victims. | ^Additionally, there were pictures and videos that depicted defendant armed with a Glock and Mr. Coleman armed with a Kimber. Particularly, one photograph[5] from defendant’s phone is of a dock with the serial number HSB144; the gun is on the lap of someone wearing white pants, which was consistent with what defendant was wearing in other pictures. With regard to this particular dock, Troy Savage testified he owned a dock model 27, bearing serial number HSB144, which was stolen from his vehicle sometime between May 14 and 17, 2013.
Colonel Tim Scanlan, the laboratory services commander for the Jefferson Parish Sheriffs Office, participated in the processing of the’ vehicle the victims were found in and also conducted an examination of the ballistics evidence, including the two firearms recovered from the scene. According to Colonel Scanlan, although only the Kimber firearm and the Colt revolver were' recovered from the scene, there were a total of five weapons involved in the shooting, and at least four were used. Based on the physical evidence recovered from both 'inside and outside of the vehicle, and the evidence recovered from the bodies of the victims, Colonel Scanlan was able to reach certain conclusions regarding how the shootings occurred. He'maintained that two shots were fired into the vehicle while the front passenger door was open and noted that the casings found in the car were consistent with someone leaning in an open passenger door and firing a weapon. A transfer pattern of blood was found on the front passenger seat indicating some blood being wiped onto a surface.
Colonel Scanlan further testified that the Colt revolver recovered from the scene had two spent, fired cartridge casings in it with four empty chambers. With , regard *473 to the Kimber, he explained that this weapon tended to jam; he was able to determine that during the shootings, two rounds were fired,, but the second one | ¿jammed, thus making the weapon useless at that point. In addition to these two recovered weapons, Colonel Scanlan also determined that two 9 mm caliber weapons and one .40 caliber Glock were used in the crimes. According to Colonel Scanlan, the .40 caliber casings recovered outside the vehicle were linked ,to the stolen Glock based on his comparison, to the test fire cartridges contained in the original gun box possessed by Mr. Savage.
Further, Colonel Scanlan testified- that a review of the grouping of casings found at the scene indicated a “focused area of fire” from the rear towards the front driver’s side, which, was consistent with a stationary vehicle, and a slightly mobile perpetrator. Additionally, Colonel Scanlan stated that the 9 mm casings recovered from inside the car were consistent with somebody going to the passenger side, reaching in, and firing two shots at one or both of the occupants of the vehicle, in a possible attempt to help an injured perpetrator get out the car. He also determined that at least one .40 caliber, round consistent with being fired from -a Glock was found in Mr. Westerfield’s body. Colonel Scanlan expressed his.opinion that the physical evidence in this case “is- consistent with a typical contact, cover type, crime, where you have one person engaging face to face ... and then you have the people who are the cover.” Colonel Scanlan added that shots were fired into the car from the contact person and the cover people, and that the scenario presented by the evidence is consistent with “the typical drug rip off,” where someone shows up to buy drugs, but instead steals them. .
In addition, David Cox, a forensic DNA analyst with the Jefferson Parish Sheriffs Office DNA Lab, examined various pieces of evidence in connection, with the homicide investigation. In his analysis, Mr. Cox determined that a swab taken from the Kimber .40 caliber pistol and a swab pf blood taken from the front |flpassenger seat of the Chevy Blazer contained DNA that was consistent, with the profile from the reference sample of Mr. Coleman. .
ASSIGNMENT OF ERROR . NUMBER ONE'
In. his first assigned error, defendant challenges the sufficiency of the evidence used to convict him of all four counts. In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or -circumstantial, or a mixture of both, viewed in the light most favorable to the. prosecution, was sufficient to convince a rational trier of fact that; all of .the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 162 L.Ed.2d 231 (2002).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, “assuming every fact to be proved' that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. State v. Baham, 14-653 (La.App, 5 Cir. 3/11/15), 169 So.3d 558, 566.

*474
Second Degree Murder Convictions (Counts One and Two)

 Second degree murder is defined in La. R.S. 14:30.1 as the killing of a human being when the offender 1) has specific intent to kill ór to inflict great bodily harm; or' 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict | mgreat bodily harm. See State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-757 (La.12/15/06), 944 So.2d 1277. Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Nelson, 14-252 (La.App, 5 Cir. 3/11/15), 169 So.3d 493, 500, writ denied, 15-685 (La.2/26/16), 187 So.3d 468.
In challenging the sufficiency of the evidence used to convict him of the two counts of second degree murder, defendant does not contest the sufficiency of the essential statutory elements of the offense; rather, he challenges his- identity as the perpetrator.. Defendant argues that the State was not able to exclude the hypothesis that he merely came .upon the scene to bring Mr. Coleman to the hospital or that the-shooter could have been wielding two firearms. Further, defendant contends that the .State’s attempt to disprove his alibi based on linking different pieces of evidence, was insufficient to support his convictions for second degree murder. We find no merit to these arguments. .
In the present case, there were rio eyewitnesses to the shootings; however, the evidence produced by the State at trial clearly established defendant’s identity as one of the perpetrators. Colonel Scanlan testified at trial that based on his examination of the evidence, five guns were involved, and four were used in the shootings. Further, his testimony suggested that more than one person was involved in the crime. Colonel Scanlan maintained that shots were fired from both the contact person and the 'cover people. ' Defendant’s cell phone was found outside the vehicle at. the scene of the shootings. A subsequent examination of defendant’s cell phone revealed pictures' of defendant armed with a Glock. In addition, pictures [^recovered showed Mr. Coleman armed with a Kim-ber. One photograph in particular found on defendant’s' cell’ phone displayed a Glock with the serial number HSB144, which was stolen from Mr. Savage in May of 2013. The .40 caliber casings recovered outside the vehicle were linked to the stolen Glock based on a comparison to the test fire cartridges contained in' the original gun box possessed by Sir. Savage. In addition', at least one .40 caliber round consistent with being fired from a Glock was found in'Mr. Westérfield’s body.
..Moreover, defendant acknowledged being with Mr. Coleman both before and after the shootings, and Mr. Coleman was linked to the crime scene through DNA analysis. Mr. Cox, a DNA analyst, testified that a swab taken from the Kimber .40 caliber pistol and a swab of the blood taken from the-front pasSenger seat of the Chevy Blazer contained DNA that was consi’sterit with the profile from thé reference sample of Mr. Coleman. Further, a single black and red Nike sandal was found outside the vehicle at the crime scene; This shoe matched' the shoe fourid iri defendant’s vehicle at the time he was stopped by police. Also, the surveillarice video from the hospital shows defendant arriving shortly after the-time of the murders with the injured- Mr. Coleman.
*475 At trial, the State additionally presented evidence that-disproved defendant’s alibi that he was at his girlfriend’s house and merely came upon the scene to-bring his friend to the hospital. In particular, Detective Barteet testified- that he interviewed defendant’s girlfriend, and neither she nor any other person indicated that defendant was at her house on the night of the shootings. The State also produced testimony that defendant fled from the detective’s bureau after being questioned about his involvement in the shootings. Evidence- of flight, ¡concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier of fact may infer guilt. State v. Lang, 13-21 (La.App. 5 Cir. 10/9/13), 128 So.3d 330, 336, writ denied, 13-2614 (La.5/2/14), 138 So.3d 1244. Lastly,, in the conversation recorded between defendant and his parents, they discussed the problem that defendant’s phone was found at the crime scene and contemplated what they should do about it.
.Given this abundance of circumstantial evidence, we find that the State proved beyond a reasonable doubt defendant’s identity as the perpetrator. Although defendant’s sufficiency argument is focused on the State’s failure to prove his identity as the perpetrator, we nonetheless note that the State also proved that defendant had the specific intent to kill or inflict great bodily harm, which is a required element under the first definition of second degree murder set forth in La.. R.S. 14:30.1(A)(1).
Specific criminal intent is “that state of mind which exists when the circumstances' indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). The determination of specific intent is a question of fact. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Durand, 07-4 (La.App. 5 Cir. 6/26/07); 963 So.2d 1028, 1034, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753. Further, a specific intent to kill may be inferred from the intentional use of a deadly weapon such as a knife or gun. State v. Cochran, 09-85 (La.App. 5 Cir. 6/23/09), 19 So.3d 497, 508, wit denied, 09-1742 (La.3/26/10), 29 So.3d 1249. The act of aiming • a lethal weapon and discharging -it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. State v. Gonzalez, 07-449 (La.App. 5 Cir. 12/27/07); 975.So.2d 3, 8, writ denied, 08-228 (La.9/19/08), 992 So.2d 949.
| -¡¡¡Given the evidence produced at trial, we find that the jury could have reasonably inferred that defendant had the specific intent to kill or inflict- great bodily harm. The State presented evidence that the victims died from multiple gunshot wounds. Specifically, Dr. Dana Troxclair, a forensic pathologist who performed the autopsy oh Dave Harrison, testified that he sustained four gunshot wounds, and Dr. Susan Garcia, a forensic pathologist who performed the autopsy on Nikiayh Wester-field, testified that .he sustained nine identifiable wounds. In addition, the State presented evidence that the vehicle the victims were found in sustained substantial damage from gunfire, and ballistics material was recovered at the scene from both inside and outside the vehicle. Further, Colonel Scanlan testified that based on his analysis of the evidence, five weapons were involved, and four had been used in the shootings. He further expressed his belief, based on the evidence analyzed, that the shooters approached the vehicle in a calculated- manner and targeted the vie- *476 tims. Thus, the State presented sufficient evidence to prove, the killing of a human being when the offender ha‘s the specific intent to kill or inflict great bodily harm.[6] See State v. Fields, 08-1228 (La.App. 4 Cir. 4/15/09), 10 So.3d 350, 355, writ denied, 09-1149 (La.1/29/10), 25 So.3d -829 (where the appellate court noted that firing, a. gun into an automobile occupied by two people is sufficient evidence of.-the intention to kill one or more of the occupants of the vehicle). :
Accordingly, based on the foregoing, we find that a rational trier of fact could have found that the evidence, although circum--stantial, was sufficient under the Jackson • standard to support defendant’s second degree murder convictions, ■
11 possession of a Stolen Firearm Conviction (Count Three) '
Defendant further challenges the sufficiency of the evidence .used .to convict him of illegal possession of a stolen firearm. At the time of the commission of the crime, La. R.S. 14:69.1(A) defined illegal possession of a stolen firearm as “the intentional possessing, procuring, receiving, or concealing of. a firearm which has been the subject of any robbery or theft under circumstances which indicate that the offender knew or should have known that the, firearm was the subject of a robbery or theft.” Therefore, based on this statutory provision, the State had to prove that defendant intentionally possessed a firearm, that the firearm was. the subject of a robbery or theft, and that he knew or should .have known the firearm , was the subject of a robbery or theft. State v. Johnson, 09-862 (La.App. 3 Cir. 2/3/10), 28 So.3d 1263, 1270.
In Louisiana, mere possession of stolen property does not create a presumption that- the person possessing the property received; it-with knowledge that it was stolen. Therefore, the State must prove defendant’s .guilty knowledge as it must prove every- other essential element of 'the offense. Jurors- .may infer this guilty knowledge from the circumstances of the offense. The inference of guilty knowledge arising from the possession of stolen property is generally a much stronger one than the inference the possessor committed the theft. State v. Chester, 97-1001 (La.12/19/97), 707 So.2d 973, 974.
With regard to his conviction for illegal possession' of a stolen firearm, defendant asserts that the pictures from' his cell phone introduced by the State failed to prove that he possessed the stolen firearm, and he further contends that the State provided no evidence that he knew or should have known that the firearm’ was stolen. .
hfiln the present case, the State presented the testimony of Troy Savage, the owner of the firearm ‘ at issue. Mr. -Savage testified that his gun, a Glock model 27 .40 caliber handgun with a-serial number of HSB144, had been' stolen from his vehicle sometime between May 14 and 17, 2013: Mr. Savage further testified that he did not authorize defendant to rémove the gun from his Car and that he did' not authorize defendant or anyone else to possess his gun between May 17, 2013, and August 17, 2013. The State presented evidence to show that the serial number on Mr. Savage’s gun was clearly .visible in a photograph on defendant’s cell phone. *477 Detective Steve Villere, an expert in digital forensics and mobile device analysis, testified that whoever was in possession of the phone also had possession of the Glock firearm between July 22 and 23, 2013. Additionally, the State presented evidence that the .40 caliber casings recovered outside the" vehicle were linked to Mr. Savage’s stolen Glock based on a comparison to the test fire cartridges contained in the original box possessed by Mr. Savage.
Detective Barteet testified that Glocks are popular guns that “are not the cheapest guns, and certainly not the most expensive.”' He stated that depending on the caliber, the price of the gun was about “400 to 600.” Additionally,.Detective Bar-teet testified that to his knowledge, defendant had no job at the time of his arrest, and he further agreed with the prosecutor’s suggestion that “going out and buying guns of this type would kind of be out of reach.”
In the present case, despite the fact that there was no direct evidence linking defendant to the theft,of the firearm,'we find that the evidence presented by the State was sufficient to prove the elements of the offense of illegal possession of a stolen firearm beyond a reasonable doubt. With regard to the element of guilty knowledge, we particularly note that a rational trier of fact could have reasonably inferred defendant’s guilty knowledge that the gun was stolen based on the use of 11Bthis gun in a double murder, in which evidence, established that defendant was one of the perpetrators. See State v. Johnson, 28 So.3d at 1272 (where the appellate court found .that the evidence was sufficient to sustain the defendant’s conviction for illegal possession of a stolen firearm despite the fact that there was no direct evidence linking the defendant to the theft of the firearm). Accordingly, we find no merit to the arguments raised by defendant in his challenge to the sufficiency of the evidence relating to his illegal posséssiori of- a stolen firearm conviction.

Conspiracy to Commit Obstruction of Justice Conviction (Count Five)

Defendant also challenges thq sufficiency of the evidence regarding his conspiracy to commit obstruction of justice conviction. La. R.S. 14:130.1 defines obstruction of justice, in pertinent part, as follows:
A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
.(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to. a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
(a) At .the location of any incident which the perpetrator knows or has good reason to. believe will be the subject of any., investigation by state, local, or United States law enforcement officers; or
(b) At the location . of storage, transfer,- or .place of review of any such evidence..
Criminal conspiracy requires an agreement or combination of two or more persons for the specific purpose of committing any crime, an act in furtherance of the object-,of. the agreement or combination,..and specific intent.. La. R.S. 14:26; State v. McClure, 14-253 (La.App. 5 Cir. 3/11/15), 169 So.3d 510, 523, writ denied, *478 15-684 (La.2/26/16), 187 So.3d 468. The |17second element of.a.criminal conspiracy, the overt act, need not be unlawful. . It may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of its object. In prosecutions for criminal conspiracy, whether an overt act allegedly served to support the object of the conspiracy is a question for the jury. State v. Lang, 128 So.3d at 333.
In an attempt to prove this offense at trial, the State introduced a recorded jailhouse telephone call between Ed Harris, defendant’s father who is incarcerated; Kanetra Whyte, defendant’s mother; and defendant. In the telephone call, the parties discussed the fact ' that defendant dropped his phone and that “they got it.” Upon learning this information, Ed Harris advised that “we just gotta figure out a reason for it being there.” Ed Harris also advised defendant “to get some bleach too when he take a bath.” In response, Ms. Whyte stated that he already did.
In addition to the recorded telephone conversation, the State introduced the testimony of Detective Barteet regarding the significance of this conversation. He explained that Ed Harris was serving a sentence for homicide. Detective Barteet acknowledged that using bleach in a bath is commonly done to destroy forensic evidence on a person’s body. He stated: “... it is known to kill everything. It has been used to clean people and scenes.” Detective Barteet also testified that defendant provided him with an explanation, as suggested by his father, for where the phone was.
Defendant contends that the evidence presented by the State was insufficient to sustain his conviction for conspiracy -to commit obstruction of justice. He acknowledges that the phone.call shows that he was conspiring with his mother and father to obstruct justice; however, defendant contends that the State failed to Improve any overt action in furtherance of the conspiracy, which is an essential element of the offense. We agree. ;
_ In the present case, the evidence reveals that defendant took a bath in bleach to remove any possible evidence prior to the phone call in which his father advised him to take that action. The jurisprudence suggests that the overt act must accompany or follow the agreement. Accordingly, since the act in this case occurred prior to any agreement between the parties, we find that the State failed, in its burden of proving “an act in furtherance of the object of the agreement or combination.” Moreover, although the parties discussed that defendant needed to come up with a reason that his cell phone was left at the scene, providing a false explanation to police does not constitute “tampering with evidence” as defined in La. R.S. 14:130.1(A). Thus,' the parties’ discussion-about providing a false explanation for his: phone being at the scene would not constitute conspiracy to obstruct justice.
In arguing that the evidence was sufficient to sustain defendant’s conviction for conspiracy to obstruct justice, the State, in its appellate brief, mentions that threats were made during the course of the conversation. Using or threatening force against a person can also be a means of obstructing justice under certain circumstances. See La. R.S. 14:130.1(A)(2). However, as evidenced by the charges given to the jury, the State did not focus on this provision in attempting to prove conspiracy to obstruct justice, but rather relied on the tampering with evidence portion of the obstruction of justice statute. Nonetheless, out of an abundance of caution, we will briefly address the applicabili *479 ty of this provision to defendant’s conspiracy charge.
In the recorded telephone call, the parties also discussed whether any witnesses were at the scene. At one point in the conversation, Ed Harris made a | inthreat about defendant’s girlfriend, commenting that “she better not F-say nothing,” and “I hope' she know how that gone turn out.” Likewise, this evidence is not sufficient to sustain defendant’s conviction for conspiracy to commit obstruction of justice. Although Mr. Harris made vague threats about defendant’s girlfriend, the parties did not come to any sort of agreement about threatening defendant’s girlfriend, nor is there any indication that she was ever threatened. In fact, Ms.' Whyte merely laughed when Mr. Harris made his comments about defendant’s girlfriend. In the present case, there is no doubt that defendant, his mother, and his father had a conversation about ways to hide defendant’s involvement in the murders; however, the State failed to prove the essential elements needed to sustain a conviction for conspiracy to obstruct justice.
Based on the foregoing, we find that viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the State proved the essential elements' of second degree murder and illegal possession of a stolen firearm beyond a reasonable doubt, and accordingly, we affirm those convictions. However, having found that the State failed to prove an essential element of the offense of conspiracy to commit obstruction of justice, wé reverse that conviction.

ASSIGNMENT OF ERROR NUMBER TWO

In his second assigned error, defendant asserts that the trial court erred in admitting into evidence the recorded jailhouse telephone call, referenced in the previous assignment of error, in which defendant, his mother, and his father participated. In their conversation, the parties were discussing actions defendant needed to take so as to not be implicated in the shootings. Defendant contends that this telephone call constituted inadmissible hearsay and that its admission violated I aphis constitutional right to confrontation since the declarants.were not available to testify at trial. •
The Sixth Amendment to -the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront witnesses against him. State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852, writ denied; 04-1399 (La.11/8/04), 885 So.2d 1118. The Confrontation Clause bars the admission of an out-of-court “testimonial” statement against a criminal defendant unless the declarant is unavailable, and the defendant had a proper opportunity to cross-examine the declarant. Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L,Ed,2d. 177 (2004); Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
While the Crawford Court specifically declined to define “testimonial,” it recognized that, at- a minimum, testimonial statements include “prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and police interrogations;” Crawford v. Washington, 124 S.Ct. at 1374. The Supreme Court stated that “testimony” is “[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.” Crawford v. Washington, 124 S.Ct. at 1364; State v. Leonard, 05-42 (La.App. 5 Cir. 7/26/05), 910 So.2d 977, 989, writ denied, 06-2241 (La.6/1/07), 957 So.2d 165;
*480 The Sixth Amendment bestows a right of confrontation: to -confront witnesses who “bear testimony” against him. According to the Supreme Court, an accuser- making a-formal statement to government officials bears testimony in a sénse that a person.-making ■ a casual remark to an aequáintance does not. Some examples of testimonial statements: include -affidavits, custodial examinations,- depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. Crawford v. Washington, 124 S.Ct. at 1364; State v. Owens, 14-41 (La.App. 5 Cir. 9/24/14), 151 So.3d 86, 93, writ denied, 14-2252 (La.10/2/15), 178 So.3d 582.
By contrast, non-testimonial statements do not cause the declarant to be a witness within the meaning of the Sixth Amendment and thus are not subject to the Confrontation Clause. Dams v. Washington, 126 S.Ct. at 2273. Phone calls from an inmate to another. private citizen are generally non-testimonial. In State v. Norah, 12-1194 (La.App. 4 Cir. 12/11/13), 131 So.3d 172, 190, writs denied, 14-84 (La.6/13/14), 140 So.3d 1188 and 14-82 (La.6/20/14), 141 So.3d 287, the appellate court discussed the nature of inmate calls as follows:
Phone calls from an inmate to another private citizen are generally ‘non-testimonial.’ ■ These conversations are simply too attenuated in kind from a police interrogation. While ■ inmates are warned that their calls are being recorded, the statements of inmates and those with whom they are speaking are ‘non-testimonial’ in that they are not attempting to prove-some fact for introduction at trial such as when the police interrogate a suspect. These statements are not made ‘to a police officer, -during the course of an investigation, or in a structured setting designed to elicit’ responses that are intended to be used to prosecute him.’ Castro-Davis, 612 F.3d at 65. These calls were conversations amongst friends, and in no way could be considered testimonial, [footnote omitted]
■ In State v. Massey, 11-357 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, writ denied, 12-991 (La.9/21/12), 98 So.3d 332, the trial court allowed a recorded telephone conversation of the co-defendant, who was incarcerated at the time, and his father to be admitted at trial. During the conversation, the co-defendant instructed his father to. offer a witness five hundred dollars to make a statement that he was unable to identify the co-defendant and his brother as the persons who committed the crime. On appeal, the defendant complained that his-right of confrontation was violated when he did not have the opportunity to cross-examine the co-defendant. This Court found that the recorded telephone conversation was made under circumstances that were non-testimonial in nature and thus did not Inviolate the defendant’s Sixth Amendment right to confrontation and cross-examination of the declarant. Massey, 91 So.3d at 479.
Likewise, in the present case, we find that the recorded telephone conversation is non-testimonial under Crawford and does not violate defendant’s right of confrontation. The statements contained in the recorded telephone conversation were spoken in casual conversation between defendant and his parents. Additionally, the parties had no expectation that their statements would be used in a prosecution, as they spoke informally and without coercion. See State v. Lang, 128 So.3d at 338-40.
Moreover, únder La. C.E. art. 801(D)(3)(b), a statement is not hearsay if it is offered against a party, and it is made by a declarant while participating in a *481 conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy is established. In State v. Lobato, 603 So.2d 739, 746 (La.1992), the' Louisiana Supreme' Court explained that a prima facie case of conspiracy is presented when the State introduces evidence which, if unrebutted, would be sufficient to establish the facts of the conspiracy. Statements made'by'co-conspirators which are the object of a defendant’s hearsay objection may be considered by the trial court in making its determination as to whether a prima facie case of conspiracy has been established.
Accordingly, based on the foregoing, we find that the trial court did not err in admitting the recorded jailhouse conversation into evidence. This assigned error is without meriti .

ERRORS PATENT REVIEW

We have also reviewed the record for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review re-' veals no errors that require corrective action.

DECREE

Accordingly, for the reasons set forth herein, we affirm defendant’s convictions and sentences for second degree murder and illegal possession of a stolen firearm; however, we reverse his conviction for conspiracy to commit obstruction of justice and vacate his sentence 6n that count.

AFFIRMED IN PART: REVERSED IN PART

JOHNSON, J., dissents in partwith reasons.

. In the indictment, the State also charged Jerremy Coleman with two counts of second degree murder, which were later amended to manslaughter, and one count of illegal possession of a stolen firearm. Tavis Joseph was charged with two counts of second degree murder, and Edward Harris and Kanetra Whyte were charged with conspiracy to commit obstruction of justice.

.Detective Gai explained that the shot spotter system "is a system that is able to listen to specific sounds of gunfire. It is also able to triangulate the specific location of gunfire in a specific area.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct, 1602, 16 L.Ed.2d 694 (1966).

. The statement that defendant provided to Sergeant Rodrigue was not recorded.

. Through the examination and analysis of the cell phone, it was determined that this photograph was taken between July 22 and July 23, 2013.

. According to the jury instructions, the State prosecuted this case under both definitions of ■ second' degree murder: specific' intent murder and murder while committing or attempting to commit armed robbery. Since we .have found the evidence sufficient to establish specific intent murder, we find it unnecessary to address the" sufficiency 'of the evidence under the felony murder definition, " ■ - ■