# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-113


**STATE OF LOUISIANA**

**VERSUS**

**TYRONE MARKEL COMPTON**

**A/K/A NOON**



**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 358,448
HONORABLE WILLIAM GREGORY BEARD, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, D. Kent Savoie, and Candyce G. Perret, Judges.


**CONVICTION AFFIRMED.**

**Hon. J. Phillip Terrell, Jr.**
**Ninth Judicial District Attorney**
**Lea R. Hall, Jr.**
**Assistant District Attorney**
**P. O. Box 7358**
**Alexandria, LA 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Mary Constance Hanes**
**Louisiana Appellate Project**
**P.O. Box 4015**
**New Orleans, LA 70178-4015**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Tyrone Markel Compton**

**Tyrone Markel Compton**
**Louisiana State Penitentiary**
**Camp C Wolf-3**
**Angola, LA 70712**
**DEFENDANT/APPELLANT:**

**GREMILLION, Judge.**

Defendant, Tyrone Markel "Noon" Compton, appeals his unanimous jury conviction for second degree murder, a violation of La.R.S. 14:30.1, asserting that the evidence adduced at trial was insufficient. For the reasons that follow, we affirm the conviction.

## FACTS AS ADDUCED AT TRIAL[1]

On October 19, 2020, Defendant and Pam Smith, his paramour, were at the Alexandria, Louisiana, apartment of Syria "Kelsey" Mahfouz. Also present were Andrew Mayo; Mayo's brother, Blaine Milliman; and Kaitlyn Carlino. The group decided to purchase thirteen Xanax bars from Leon "Lee Jack" Anderson and drove to Pineville to purchase them after midnight on October 20.

The transaction occurred at a parking lot on Bragg Street in Pineville, Louisiana. After Anderson and Edwin Davidson, who accompanied Anderson, left, the group discovered that they had purchased not thirteen bars, but five bars and paper that masqueraded as Xanax bars.

Despite their feelings of customer dissatisfaction, the group consumed the five Xanax back at Mahfouz's apartment. Defendant and Mayo in particular were angry over having been cheated. Sometime after 1:00 a.m. on October 20, Terrence "Dugga" Armstrong arrived. Armstrong was known by members of the group to carry a rifle. Defendant armed Mayo with Smith's pistol and himself with Milliman's handgun. Armstrong, Mayo, Smith, Defendant, and Carlino left in Carlino's car. Smith drove to Anderson's address, where the male occupants opened fire. The vehicle then left the scene. Inside the apartment, Davidson was struck in the head and killed by one of the shots.

---

[1] The material facts of this case are not disputed by Defendant or the State.

Before October 20, Anderson and Defendant had not been on friendly terms, as Defendant had once tried to sell Xanax to Anderson and a group of associates, who, according to Defendant, decided instead to forcefully seize Defendant's wares. This attempt failed. Defendant described Anderson and his associates as "jackboys," indicating they would rob other drug dealers.

On October 16, 2020, Defendant's friends had sought pills from Anderson at Anderson's house on Orchard Loop Road in Pineville. As the group was leaving, someone fired a shot at their car. Defendant was in the car at the time this exchange took place.

On October 20, Sergeant Vince Deville of the Pineville Police Department responded to a dispatch regarding shots having been fired in the Orchard Loop Subdivision, an area of Pineville that witnesses a disproportionate level of crime. He arrived at 343-B Orchard Loop, a duplex, and found several people inside in a state of grief and bewilderment. Sergeant Deville found a man, later determined to be Edwin Davidson, deceased from a head wound. Sergeant Deville secured the scene and contacted the detectives on call.

Video surveillance procured from cameras in the vicinity showed the shooting. A blue Toyota Matrix with no illuminated passenger-side headlight drove by, and fire erupted from both sides of the vehicle. The car continued on its way after the shooting ceased.

Sergeant Jared Bennett conducted the crime scene investigation. He located several spent 9mm and .223 or 5.56mm cartridge cases and projectiles in the roadway. Bullet holes pocked the residence.

From interviewing the other occupants of the house, detectives developed a lead indicating that the blue car was associated with Mahfouz. Detective Supervisor Cody Griffith and Detectives Katie McBride and William Smith went to Mahfouz's

2

address, 4109 Pisciotta Street in Alexandria, and contacted Mahfouz, Smith, Defendant, and others. The detectives determined who they needed to interview and transported them to the police department, where they were interviewed. During these interviews, the detectives learned that Carlino owned the car. Detective Griffith contacted Carlino's father, who brought her and the car to the station to be interviewed.

The State concedes that the bullet that fatally wounded Davidson came from Smith's gun, which was wielded by Mayo. The bullet came from a 9mm handgun, and it was not fired by Milliman's gun. Smith's gun, though, has never been recovered.

Detective McBride, the lead investigator, obtained Defendant's phone pursuant to a search warrant. Curtis Gunter with the Rapides Parish Sheriff's Office downloaded the contents of the phone. This data was fed into Cellebrite, a software package that interprets the data. Among the calls from Defendant's phone on the night in question were three to Armstrong between 12:15 and 1:00 a.m. All three of the calls were answered. A user of the phone deleted the calls from the call history.

Defendant was interviewed by Detective McBride. At first, he denied any involvement in the shooting. Later, he admitted to being in the car but placed the blame for the shooting on Mayo and Armstrong. Defendant clearly indicated that the act of shooting the duplex was to retaliate for being shorted the quantity of pills for which the group had paid. When confronted with the fact that bullets had narrowly missed children in the house, Defendant said, "I didn't know they had kids in there . . . Like I'm glad they didn't get hit because it wasn't meant for them to get hit."

The detective interviewed Carlino in the presence of her father. The rest were interviewed separately. Those statements were not published to the jury.

3

After viewing the evidence and hearing the information detailed above, the jury unanimously convicted Defendant of second degree murder. Defendant appeals his conviction, arguing that the conviction was not sufficiently supported by the evidence; specifically, Defendant argues that the State failed to prove that anyone in the car intended to shoot anyone in the house or even that anyone knew people were in the house at the time of the shooting.

**DISCUSSION**

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 127 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Moody*, 393 So.2d 1212 (La.1981).

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant was convicted of second degree murder, a violation of La.R.S. 14:30.1, which provides, in pertinent part:

> A. Second degree murder is the killing of a human being:
>
> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
>
> (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

Defendant was indicted for the offense either by virtue of specific intent to kill or inflict great bodily harm or by his actions as a principal to the assault by drive-by shooting, defined by La.R.S. 14:37.1 as, "an assault committed with a firearm when an offender uses a motor vehicle to facilitate the assault." The statute further

4

provides, "As used in this Section and in R.S. 14:30(A)(1) and 30.1(A)(2), the term 'drive-by shooting' means the discharge of a firearm from a motor vehicle on a public street, highway, or interstate highway with the intent either to kill, cause harm to, or frighten another person." La.R.S. 14:37.1(C). An assault is an attempted battery or "the intentional placing of another in reasonable apprehension of receiving a battery." La.R.S. 14:36. "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24. Assault and its related offenses are general-intent crimes, which means that the State must prove that the offender either 1) "actively desired the prescribed criminal consequences to follow his act" (specific intent) or 2) that the circumstances indicate that the prescribed criminal consequences were reasonably certain to result from his act. La.R.S. 14:10—11.

First, we note that intent to actually kill or even wound anyone in the house is not an essential element of the offense. To prove that an assault by drive-by shooting occurred, the State must prove the discharge of a firearm from a motor vehicle on a public street with intent to kill, harm, or frighten. Defendant clearly participated in the drive-by shooting. He discharged Milliman's gun from the car, which was being driven on a public street. He armed Mayo with the handgun that fired the fatal shot.

Defendant, though, challenges the intent element of the crime; if he did not know that anyone was home, Defendant asserts he could not have intended to frighten anyone in the home per La.R.S. 14:37.1 or place them "in reasonable apprehension of receiving a battery" per La.R.S. 14:36. Proof that he knew anyone was home is lacking, Defendant argues. Defendant argues that this contention is

5

established by Smith's testimony that they did not realize anyone was actually in the house.

Whether a defendant formulated intent is a question of fact. *State v. Harris*, 15-485 (La.App. 5 Cir. 4/13/16), 190 So.3d 466, *writ denied*, 16-902 (La. 5/12/17), 220 So.3d 746. Proof of intent "may be inferred from the intentional use of a deadly weapon such as a knife or gun. The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." *Id*. at 475 (citations omitted). Similarly, the act of aiming a weapon at a home and discharging it can reasonably be interpreted by a jury as evidence of intent to at least frighten, if not actually injure or kill, those in the home.

Smith testified that the plan was for Armstrong to confront Anderson at the house, but then gunfire rang out and she sped away. The initial plan of confronting Anderson was confirmed by Carlino. Carlino also testified that as the car approached the house, Smith stopped the car, but Defendant told her to "just go ahead and go, drive around." Contrary to Defendant's assertion, the testimonies of Carlino and Smith indicate that they had a strong belief that Anderson was home. One cannot confront someone who is not present.

Defendant told the police that the goal of the group was to retaliate against Anderson for cheating them. He also told Detective McBride that they did not know that there were *children* in the house; the natural negative inference any reasonable juror could draw is that they did know that others were in the house. No one mentioned a change of plans involving shooting the house, yet all three men began shooting as the car passed the house. Carlino also described the men's jubilance after the shooting:

6

A       We go back to Mr. Compton's house.  I know after that everybody was kind of, I was kind of scared at the moment.  I'm not going to lie, very scared actually.  So I kind of just tried to act normal.  We got back to the house.  They were all happy.

Q       When you say they were all happy, who was all happy?

A       Andrew, Mr. Compton, Mr. Armstrong.  They, they were like we just, we just did that, but they, it's okay, they're not going to call the police, they'll handle it in the streets.  I don't remember exactly who said that, but I know for sure I heard it.

The shooting happened after 1:00 a.m. on October 20, when there was more than a reasonable probability that people were within the duplex.  Mayo, Armstrong, and Defendant discharged a significant volley of rounds at the duplex.  After the incident, the men assured themselves that law enforcement was unlikely to become involved and that they had conveyed the appropriate message to the duplex's inhabitants.  Given these facts, any reasonable juror could find that the prescribed criminal consequences were either actively desired or reasonably certain to result from their actions, i.e., Defendant intended to commit an assault by drive-by shooting.  That assault by drive by shooting resulted in the death of Edwin Davidson.  Accordingly, we affirm Defendant's conviction for second degree murder.

### DECREE

Defendant's conviction is affirmed.

**CONVICTION AFFIRMED.**