STATE OF LOUISIANA

VERSUS

COREY WOODS

NO. 23-KA-41

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 17-1036, DIVISION "L"
HONORABLE DONALD A. ROWAN, JR., JUDGE PRESIDING

November 15, 2023

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and Robert A. Chaisson

<u>**AFFIRMED**</u>
**MEJ**
**JGG**
**RAC**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Honorable Paul D. Connick, Jr.
      Thomas J. Butler
      Anne M. Wallis
      Douglas W. Freese
      Jennifer C. Voss

COUNSEL FOR DEFENDANT/APPELLANT,
COREY WOODS
      Corey Woods
      Prentice L. White

**JOHNSON, J.**

In his second appeal, Defendant, Corey Woods a/k/a "Cocomo", seeks review of his convictions for three counts of second degree murder and one count of possession of a firearm by a convicted felon, and the resulting sentences. For the following reasons, Defendant's convictions and sentences are affirmed.

### FACTS AND PROCEDURAL HISTORY

In his first appeal, this Court found that upon the granting of Defendant's Motion for Appeal, the trial court was divested of jurisdiction to subsequently sentence Defendant or to rule on Defendant's Motion for New Trial and Motion for Post-Verdict Judgment of Acquittal. As such, we vacated the sentences and the trial court's rulings on Defendant's motions, and remanded this matter for the trial court to rule on Defendant's motions and, if the motions were denied, resentence Defendant. This Court also reserved Defendant's right to appeal his convictions and sentences in the event Defendant's motion for a new trial was denied, upon resentencing. *State v. Woods*, 19-200 (La. App. 5 Cir. 12/26/19), 288 So.3d 256, 257-58; 259.

On June 25, 2020, on remand, the trial court granted defendant's Motion for New Trial based on *Ramos v. Louisiana*, 590 U.S. - - , 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), as the case was on direct review and Defendant was convicted by a non-unanimous jury. *See State v. Woods*, 19-200 (La. App. 5 Cir. 12/26/19), 288 So.3d 256, 257-58. On August 16, 2022, the case again proceeded to trial before a twelve-person jury, and on August 19, 2022, the jury unanimously found Defendant guilty as charged of second degree murder in violation of La. R.S. 14:30.1 (counts one, two, and three) and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count four).

On August 29, 2022, Defendant filed a Motion for New Trial that was denied on September 2, 2022. Thereafter, defense counsel waived the sentencing delays, and the trial court sentenced Defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence each on counts one, two, and three, consecutively. The trial court also sentenced Defendant to imprisonment at hard labor for twenty years without benefit of parole, probation, or suspension of sentence on count four, to run concurrently with the sentences on counts one, two, and three and the sentence in case number 17-1037. On September 12, 2022, the district court granted Defendant's Motion for Appeal.

The testimony and other evidence presented at Defendant's second trial are summarized below.

On January 22, 2017, at approximately 9:41 p.m., the first of several 9-1-1 calls were made regarding a shooting inside a vehicle that crashed into a utility pole in the 1400 block of South Laurel Street in Metairie. Detective Joseph Waguespack, formerly employed by the homicide division of Jefferson Parish Sheriff's Office ("JPSO"), went to the crime scene where three victims, later identified as Malcolm Wallace, Monica Bates, and Daneka Lott, were found inside the vehicle. Ms. Bates was already deceased, and Malcolm[1] and Ms. Lott were taken to the hospital, where they ultimately passed away. Detective Waguespack subsequently supervised the collection of evidence and interviewed Malcolm's siblings, Montrell and Maya Wallace, at the detective bureau that night. Later, he obtained pertinent cell phone records and surveillance videos from the security cameras of businesses nearby.

Detective Waguespack testified that Montrell and Maya told him that the victims left their mother's residence on South Laurel Street, and went to Academy

---

[1] Malcolm Wallace will be referred to as "Malcolm," and his brother, Montrell or Monty Wallace, will be referred to as "Montrell" in this opinion.

Sporting Goods ("Academy"). He found two receipts in the car from Academy and Taco Bell. The Taco Bell receipt showed a purchase of one small Pepsi on January 22, 2017, at 9:26:51 p.m. The Academy receipt showed a purchase on January 22, 2017, at 9:29 p.m. of a pair of Nike men's Benassis slippers; the slippers were not found in the vehicle.

Detective Waguespack further testified that Academy's parking lot could be observed in the background of the surveillance video of the Taco Bell drive-thru. Detective Waguespack asserted that he could see someone in the back seat of the vehicle at the Taco Bell wearing a red "Reallionaire" hoodie or sweatshirt. He stated that he also obtained surveillance video from Academy, which showed Ms. Lott and Ms. Bates entering and leaving the store. Detective Waguespack thought that in the video it looked like Ms. Bates was holding the slippers up like they were on a hanger.

Detective Waguespack stated that the car left Academy at 9:31:55 and that the homicides occurred at approximately 9:41:49. The detective confirmed that the distance between the Academy and the crime scene could be travelled in about ten minutes without speeding on a Sunday evening. A surveillance video of the crime scene was obtained from what was then Electronics Depot off of Airline Highway on North Laurel Street. Detective Waguespack testified that Montrell and Maya Wallace identified Defendant as the man in the red shirt running in the video.

Expert forensic pathologist Dr. Dana Troxclair testified that she performed the autopsies on the three victims and that, for each, the manner of death was homicide. Dr. Troxclair further testified that Ms. Bates sustained a perforating gunshot wound to the head and that the path of the projectile was from back to front, left to right, and slightly downward. She determined that the range of fire was distant (over two to three feet) because she did not see any soot, searing of edges, or stippling on the surrounding skin.

Malcolm sustained two gunshot wounds. Dr. Troxclair explained that a projectile entered his left shoulder and went through his spinal cord – Malcolm would have been permanently paralyzed as a result of this injury had he survived. The projectile was recovered from Malcolm's right arm. She asserted that the wound was consistent with a gun being fired from someone sitting in the rear seat of the vehicle toward an individual sitting in the front passenger seat. She determined that the range of fire was distant (over two to three feet) because she did not see any soot, searing of edges, or stippling on the surrounding skin. Dr. Troxclair also testified that Malcolm also sustained a graze wound to his mid-forehead.

Ms. Lott sustained a perforating gunshot wound to the head; it entered on her right posterior scalp and exited on the right frontal scalp. She determined that the gunshot wound was distant as there was no searing or stippling. Dr. Troxclair asserted that the path of the projectile was back to front and slightly downward with no deviation to the left or right. She provided that the gunshot wound was consistent with someone sitting in the rear seat shooting at someone sitting directly in front of him. The three autopsy reports and several photographs were admitted into evidence.

Deputy Jene Rauch, accepted by the trial court as an expert in the fields of firearm identification and shooting incident reconstruction, testified that she previously worked at the Jefferson Parish Sheriff's Office crime lab. Deputy Rauch further testified that she reviewed and verified the initial examiner's work. Five 9 mm casings, a copper-jacket fragment, a copper-jacketed projectile, and a lead light projectile were recovered from inside the vehicle at the crime scene. Deputy Rauch concluded that the five 9 mm casings were all fired from the same weapon. She also concluded that the copper-jacketed projectile was consistent with .38 caliber ammunition, which includes 9 mm bullets. Deputy Rauch testified that the

firearms evidence was consistent with one weapon, a Glock, being used. Deputy Rauch stated that the projectile recovered from Malcolm's autopsy, a .38 caliber projectile, was intact. The fragment recovered had polygonal rifling – the same style of rifling as the projectile. However, Deputy Rauch could not confirm whether both had been fired from the same weapon.

Moreover, all of the evidence found at the crime scene was located inside the vehicle. Deputy Rauch indicated that police found Ms. Bates in the rear passenger seat on the driver's side, Ms. Lott in the driver's seat, and Malcolm in the front passenger seat. Deputy Rauch testified that she was able to reconstruct the shooting based on her personal observations of the crime scene, as well as the crime scene photographs. She opined that considering the location of the casings and the projectile damage to the vehicle, the evidence was most consistent with the shooter being in the back seat of the vehicle at the time the incident occurred, and inconsistent with the shooter firing into the vehicle from outside of the vehicle. Deputy Rauch opined that the shooting probably occurred while the vehicle was in motion.

Montrell Wallace testified that Ms. Bates was his sister, Malcolm was his brother, and Ms. Lott was the mother of his brother's child. Montrell further testified that, a few hours before the murders, they were at his mother's house watching the playoff football game between the Patriots and the Steelers. He explained that at some point, he left the house to buy marijuana and ran into Defendant, a childhood friend whom he had known his whole life. After he purchased the marijuana, Defendant followed him to his house without being invited. Montrell recalled that he and Defendant went upstairs, smoked marijuana, and watched the rest of the football game.

At the end of the football game, Defendant asked Malcolm to take him to Academy so he could buy some Nike slippers. Malcolm, Ms. Lott, and Defendant

left the house and got into Ms. Lott's grandfather's car. Ms. Lott got into the driver's seat, Malcolm got into the front passenger seat, and Defendant got into the rear passenger seat behind Ms. Lott. Montrell thought they must have picked up Ms. Bates, who was coming from a friend's house, as they were leaving because he did not see her get into the car. Montrell went back into the house after he saw the car pull out of the driveway. Montrell testified that he saw Defendant with a weapon that night. Montrell was not familiar with guns but that he thought that the gun was a 9 mm with an extended clip on it. Montrell recalled that Defendant was wearing a red sweater or hoodie with writing across it that said "Reallionaire."

Montrell testified that later they heard a loud crashing sound. He and his sister Maya went outside and saw Ms. Lott's grandfather's car had crashed into a pole. They ran to the car and saw that Malcolm and Ms. Bates had been shot. He recalled that Malcolm was still alive and in and out of consciousness. Montrell asserted that he asked Malcolm who shot him and where, but Malcolm just told him to call their mother.

Montrell testified that the police later asked him to look at two surveillance videos, State's Exhibit 86 *in globo*. He identified the man running in one of those videos as Defendant and that the man's clothing was the same clothing that Defendant wore at Montrell's mother's house earlier that evening. Montrell also testified that in the Taco Bell drive-thru surveillance video, the individual in the back seat wore the same outfit that Defendant was wearing at his mother's house. He explained that, although he could not see the face of the person in the Taco Bell drive-thru video, the clothing of the man in the back seat was the clothing he saw Defendant wearing that night. He also explained Ms. Lott and Malcolm were wearing the same clothing in the Taco Bell drive-thru video he had observed them wearing at his mother's house earlier that night. Montrell testified that he had known Defendant his entire life, he recognized the way the person was running in

the video, and that he had seen Defendant run like that before. He stated that Defendant was not wearing a hat that night.

Maya Wallace testified that Ms. Bates was her sister, Malcolm was her brother, and Ms. Lott was Malcolm's fiancée and the mother of his child. She stated that they grew up with Defendant. Ms. Wallace further testified that she did not watch the football game on the night in question, but she went to see who was watching the game. She recalled that Defendant, Malcolm, Ms. Bates, and Ms. Lott were there. Ms. Wallace testified that Defendant was wearing a red hoodie that said "Reallionaire" on it. She further testified that at some point, Malcolm, Ms. Bates, Ms. Lott, and Defendant left the house. She stated that she did not go outside to see who got into the car. Ms. Wallace recalled that they indicated they were going to Academy but she did not know why. She also recalled that her six-year-old son wanted to go with them, but she did not allow him to go because it was late at night. Ms. Wallace asserted that her son was crying, so Defendant gave him five dollars not to go. She further asserted that they all walked out together and that Defendant was the last person to leave the house.

Ms. Wallace saw Defendant with a gun the night of the murders and testified that he always had a gun on him. The police showed her surveillance videos from Taco Bell and the Electronics Depot security cameras, State's Exhibit 86. She identified Defendant in those videos and explained that Defendant was wearing the same "jacket" in those videos that he was wearing that night at the house.

Ms. Wallace testified that at some point she heard a crash, after which she walked outside and saw Ms. Lott's grandfather's car at the pole. She further testified that she walked back inside and told her mother that it looked like the car had crashed into the pole. They walked outside and saw that Malcolm was still alive. Malcolm asked for their mother but never said who shot him. Ms. Wallace called 9-1-1 and told them Terry Lloyd had killed her family. Ms. Wallace further

testified that she did not see Mr. Lloyd kill her family nor did she see him there that night. She did not see or hear anything that night that would lead her to believe that Mr. Lloyd was in the car or on that street. Ms. Wallace gave the 9-1-1 operator Terry Lloyd's name because, earlier that day, Mr. Lloyd had threatened to kill her mother, brother, and sister in order to get to Malcolm. Detective Waguespack testified that the police interviewed Terry Lloyd and asked about his whereabouts that night. Still photographs of Walmart security camera surveillance video were entered into evidence and published to the jury. The photos showed Terry Lloyd entering and exiting the Walmart, and his vehicle leaving the Walmart 11 minutes before the 9-1-1 call. Detective Waguespack confirmed that phone records "reflect[ed] a large number of communications that day" between Defendant and Terry Lloyd, and testified that Terry Lloyd was not wearing a red "Reallionaire" shirt in the surveillance photos.

The Court allowed the State to treat Lionel Alexander as a hostile witness over the defense's objection. Mr. Alexander testified that on January 22, 2017, he was on North Elm Street on the upstairs balcony of a friend's apartment smoking marijuana when he saw a car crash into a pole. Then, he saw someone wearing a red "Reallionaire" hoodie with white writing on it get out of the car, run across Airline Highway, and then across the bingo hall parking lot. Mr. Alexander explained that when the man first got out of the car, he could not see the man's face from that distance; however, Mr. Alexander stated that when the man ran closer to him, he could see the man's face. He further testified that on January 27, 2017, he identified Defendant, whom he knew beforehand, in a photographic lineup as the man he saw run across the street that night.

Mr. Alexander also recalled seeing Defendant earlier that day wearing a "Reallionaire" shirt but insisted that his identification was from Defendant's face and the shirt. He denied telling Jermika Lang that he lied about being near the

scene that night.[2] Mr. Alexander admitted that he did not tell the police right away about what he saw in the instant case. He subsequently was arrested for committing a crime, and then asked to talk to the police about the instant case. Mr. Alexander testified that he was on probation or in drug court at that time, he had recently been locked up for failing a drug test, and he was in a treatment facility.

Jermika Lang testified that on January 22, 2017, she was on her phone sitting in a car parked in her grandmother's yard on South Laurel when she heard four gunshots. The court granted the prosecution's motion to treat Ms. Lang as an adverse witness under La. C.E. art. 611(C). She recalled telling the detective that she then saw a man wearing a red sweatshirt and a black knit cap running from a car that had hit a telephone pole. Ms. Lang claimed she only told the detective that because he threatened to take her children away from her. She later admitted that she heard the car crash and the four gunshots and looked up. Ms. Lang remembered that the backseat driver-side door of that car was open. She also admitted that she saw somebody run down South Laurel (on the same side of the street as the driver's side of the car) to the corner and then turn right on Mistletoe.

Ms. Lang contended that she did not see that person's face and she saw the person wearing a sweatshirt, although she did not remember if the sweatshirt was red. She did not remember the person wearing a knit cap. Ms. Lang testified that she did not see anyone on the street at the time of the shooting except for the man who was running down the street. She had known Defendant all of her life but insisted she was not concerned with retaliation. Ms. Lang saw Montrell approach the car and ask Malcolm who did this to him. Ms. Lang also testified that she knew Mr. Alexander and that he told her he lied when he was in front of "this judge."

_____

[2] According to a Notice of Additional Information filed on August 2, 2022 by the Jefferson Parish District Attorney's Office, that same day, Ms. Lang met with representatives and told them that the detective who initially interviewed her did not like her answers and compelled her to say that the perpetrator was wearing a red shirt. She also claimed that Mr. Alexander told her that "he lied because he had a beef with 'Cocomo'" when she asked why Mr. Alexander lied because she never saw him on the street where the homicides occurred.

She stated that nobody was at the scene other than her and the victims. She admitted she had been convicted of the felony offense of resisting arrest but stated that she did not receive a deal from the State in exchange for her testimony.

Detective Waguespack testified that on January 24, 2022, two days after the homicides, Defendant was arrested, and his cell phone was seized. Defendant was advised of his rights. Defendant waived his rights, completed a JPSO rights of arrestee form, and then gave a statement to another detective. A recording of Defendant's statement was published to the jury. Defendant told the detective that he was a family friend and good friends with Malcolm's uncle, Otis Wallace. He stated that on the night in question, he ran into Malcolm[3], after which he walked with Malcolm to the Wallaces' home. Defendant stated that he arrived at the Wallaces' house at approximately 8:40 p.m., where he watched the game with Malcolm. Defendant recalled that Montrell was there as well and that Ms. Bates was in and out of the house. He told the detective that he and Malcolm talked about the game, but otherwise refused to talk about the specifics of their conversation.

During his statement, Defendant explained that Malcolm and his girlfriend said they were going to Academy when the game ended. He claimed that he did not know why. Defendant asserted that he left first, then Malcolm and "them" left afterwards. He stated that he walked up Laurel Street toward the tracks and sat down on a back street by himself. Defendant refused to say where he went next. He stated that he did not want to talk about what he had heard on the street about the homicides. When asked what he was wearing on the night of the murders, Defendant responded that he was wearing what he had on (during the statement). The video reflected that Defendant was wearing a dark-colored hooded sweatshirt

---

[3] A review of the recorded interview reveals that, on January 24, 2017, Defendant told the detective that he met Malcolm on the street the night of the homicides. However, both Defendant and Montrell testified at trial that they encountered each other on the street before going to the Wallace home to smoke marijuana and watch the game that night.

with white writing on it and a pair of white and dark-colored, patterned pants. Afterwards, Defendant said that he did not want to talk anymore. Defendant denied shooting the three victims.

Detective Anthony Buttone testified that he worked for JPSO's homicide section and that he also handled cell phones and "geo-location data plotting." He provided that he reviewed the cell phone records of Defendant and Mr. Lloyd that were produced pursuant to search warrants directed to T-Mobile and Sprint. He indicated that he also reviewed the PowerPoint created by then-retired Detective Zanotelli, which consisted of maps showing the homicide scene, Academy, Taco Bell, the cell phone towers, and the relevant phone calls and texts made by Defendant and Mr. Lloyd.

Detective Buttone stated that the phone records were consistent with Defendant being in the area of the homicide scene on January 22, 2017, between 8:01 p.m. and 8:55 p.m., after which Defendant moved, and his phone connected to the tower that serviced Academy and Taco Bell from 9:22 p.m. to 9:33 p.m. He also stated that the phone records were consistent with Defendant leaving Academy and traveling back to the homicide scene, stating that his phone connected to the tower at 9:51 p.m. and 9:59 p.m. Detective Buttone pointed out that there was no activity on Defendant's phone after the last call connected at 9:33 p.m. until 9:51 p.m. He asserted that the homicides occurred between those times.

Detective Buttone further testified that between January 16 and January 23, 2017, Defendant and Mr. Lloyd communicated on their phones fifty-five times. He stated that on the date of the homicides on January 22, 2017, between 8:46 p.m. and 9:21 p.m., Defendant and Mr. Lloyd communicated by text messages sixteen times. Detective Buttone explained that in his experience, text messages were a covert way of communicating with someone. He also stated that between 8:46 p.m. and 8:53 p.m., those connected calls were hitting off the tower with the strongest

signal, which was the tower nearest the homicide scene. Detective Buttone asserted that at 10:23 p.m., there was a phone call between Defendant and Mr. Lloyd. Detective Buttone testified that Mr. Lloyd was deceased at the present time and that he died from a homicide unrelated to the instant case. He explained that a suspect, now also deceased, was charged in that case. Additionally, the State and the defense entered into several stipulations regarding his prior convictions.

At trial, Defendant testified that on January 22, 2017, he went with his cousin, Joseph Woods, to sell marijuana to Montrell. Defendant stated that Montrell was a close friend of the family, so he knew he would be welcome at the Wallaces' home. He went to the Wallaces' house where they "chilled," smoked marijuana, and watched the game. Defendant asserted that after the game, he left. He denied asking anyone to go to Academy so someone could buy him slippers and testified that he did not get in the car on January 22, 2017, with the three victims. Defendant claimed that he left the house and went down South Laurel.

Defendant testified that Ms. Bates did not get into the car and give him the slippers and that he did not give Ms. Wallace's six-year-old son five dollars to stay home. He also testified that Ms. Wallace lied when she said he left with the victims to go to Academy. Defendant asserted that Montrell lied when he said that Defendant had a gun and wanted to go to Academy, and he saw Defendant get into the car. Defendant believed that Ms. Wallace and Montrell lied because they think he knows who killed the victims, but he insisted that he had no motive to kill them. Defendant testified that he and everyone in the neighborhood knew about the trouble between Mr. Lloyd and Malcolm. He further testified that he did not plan on running into Montrell or going to the Wallace home that evening.

Defendant stated that he was arrested on January 24, 2017, for three counts of distribution of heroin, and that he gave a voluntary and true statement to the police. Defendant testified that when he was arrested, the police took his only cell

phone, which was the same cell phone he had on the night of the murders. Defendant claimed that his cell phone did not have a code, that it could have been opened, and that the messages between him and Terry Lloyd could have been seen. Defendant knew Mr. Lloyd from the neighborhood; he was older than Mr. Lloyd and had known him his whole life, but stated that they were not friends. Later, he explained, "We was all friends to tell you the truth, we were all cool, like just knowing each other from the neighborhood until something occurred."

Defendant contended that he had a business relationship with Mr. Lloyd. He maintained that the communications prior to the homicides involved the buying and selling of drugs, and that there was a lot of communication between him and Mr. Lloyd because of their business dealings. Defendant claimed that, on January 22, 2017, they were texting about drugs. Defendant testified that he had one of the phones when he went to the Wallaces' house, but then corrected himself and claimed he only had one phone. He admitted he had the phone at the Wallaces' house and later when he left and crossed the tracks the night of the homicides.

Defendant denied having a gun on the day or the evening of the homicides. Defendant provided that if he did carry a gun, it was because he had a lot of money. He pointed out that he had never been convicted of any violent offenses, that he had never hurt anyone, and that he did not hurt the victims. Defendant testified that Ms. Wallace and Montrell were lying when they said he was wearing a red hoodie on the night of the homicides. He claimed he was wearing a blue hoodie and blue jeans—the same clothes he was wearing when he was arrested on January 24, 2017. Defendant stated that he did not own a red "Reallionaire" hoodie and had never worn one.

The defense rested after Defendant's testimony. The jury convicted Defendant on all four counts by a verdict of 12 - 0 after three hours of deliberations. On September 2, 2022, at the beginning of the sentencing hearing,

the district court denied Defendant's Motion for New Trial in open court, which he filed to preserve the right to appeal his convictions based on insufficiency of the evidence. After a victim impact statement given by the victims' grandmother, Defendant was sentenced to three consecutive life sentences on counts one, two and three, without benefit of parole, probation, or suspension, to run concurrently with a twenty-year sentence without benefits on count four.

## *ASSIGNMENTS OF ERROR*

Defendant's appellate counsel assigns insufficiency of the evidence as error. Defendant argues that the district court abused its discretion when it accepted the jury's verdict when the record reflects that it was based exclusively on circumstantial evidence. The prosecution's theory of the case was that Defendant shot each of the three victims at the behest of Terry Lloyd.[4] Defendant contends that the State presented only circumstantial evidence that he shot and killed the victims: "his alleged clothing [that he was wearing the night of the shootings], and his alleged communications with [Mr. Lloyd,] who allegedly threatened one of the [victims] and their family members earlier" that day, and that Mr. Lloyd was in constant contact with him prior to the shooting. Defendant argues that, without the recovery of the firearm used to commit the crimes or any physical evidence that proves that he and no one else, shot the three victims, "the prosecution's case was based on speculations and innuendos," and the evidence presented by the State was not sufficient to convict Defendant of possession of a firearm and three counts of second-degree murder. Defendant's counsel requests that this Court find the evidence was insufficient in the case, reverse Defendant's convictions, and enter a judgment of acquittal.

In his *pro se* brief, Defendant avers that the district court erred when it denied trial counsel the opportunity to re-urge pre-trial motions from the prior trial

---

[4] Mr. Lloyd was killed in an unrelated incident prior to the second trial.

before the new trial and rested on its previous rulings. Defendant requests that his convictions and sentences be vacated and the matter be remanded for further proceedings.

The State counters that Defendant has failed to show that the evidence used to convict him of three counts of second degree murder, in violation of La. R.S. 14:30.1, and one count of felon in possession of a firearm, in violation of La. R.S. 14:95.1, was insufficient under the standard set forth in *Jackson v Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The jury found Defendant guilty beyond a reasonable doubt after hearing all testimony and viewing all of the evidence and the State avers that it carried its burden of proof (specifically regarding the identification of Defendant as the perpetrator of the subject crimes), and this Court should not second guess the jury's credibility determinations.

## LAW AND DISCUSSION

The constitutional standard for testing the sufficiency of the evidence, as enunciated in *Jackson v. Virginia*, *supra*, is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *State v. Scott*, 06-134 (La. App. 5 Cir. 7/25/06), 939 So.2d 462, 470, *writ denied*, 06-2133 (La. 3/30/07), 953 So.2d 61. Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. *State v. Flores*, 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122. Rather, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable

doubt. *Id. See also Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Ortiz*, 701 So.2d at 930.

Evidence may be either direct or circumstantial. *Flores*, 66 So.3d at 1122. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *Id.*; *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208. This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id*.

In the instant case, Defendant was convicted of three counts of second degree murder and one count of possession of a firearm by a convicted felon. Second degree murder is defined in pertinent part as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1).

Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and actions of the accused as well as the extent and severity of the victim's injuries. *State v. Chester*, 19-363 (La. App. 5 Cir. 2/3/21), 314 So.3d 914, 942, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321. Specific intent to kill may be

inferred from a defendant's act of pointing a gun and firing at a person. *State v. Anderson*, 18-45 (La. App. 5 Cir. 10/17/18), 258 So.3d 997, 1002, *writ denied*, 18-1848 (La. 4/15/19), 267 So.3d 1131. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the *Jackson* standard. *State v. Patterson*, 10-415 (La. App. 5 Cir. 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037.

To support a conviction under La. R.S. 14:95.1, the State must prove beyond a reasonable doubt that defendant had: (1) possession of a firearm; (2) a prior conviction for an enumerated felony; (3) absence of the ten-year statutory period of limitation; and (4) the general intent to commit the offense. *State v. Chairs*, 12-363 (La. App. 5 Cir. 12/27/12), 106 So.3d 1232, 1250, *writ denied*, *State ex rel. Chairs v. State*, 13-306 (La. 6/21/13), 118 So.3d 413. With respect to the third element, the State must prove that ten years has not elapsed since the date of completion of the punishment for the prior felony conviction. *State v. Miller*, 20-182 (La. App. 5 Cir. 12/23/20), 308 So.3d 1246, 1255, *writ denied*, 21-233 (La. 4/27/21), 314 So.3d 838.

Encompassed in proving the elements of any offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof under *Jackson*. *State v. Taylor*, 99-296 (La. App. 5 Cir. 7/27/99), 740 So.2d 216, 222, *writ denied*, 99-2609 (La. 3/17/00), 756 So.2d 322.

Upon review of the record, we find that a rational trier of fact could have found that the circumstantial evidence was sufficient under the *Jackson* standard to convict Defendant of three counts of second degree murder and possession of a firearm by a convicted felon. The murder weapon was never recovered and no

physical evidence placed Defendant in Ms. Lott's car that evening.  However, using surveillance video, phone records, and/or the testimony of Maya and Montrell Wallace, Lionel Alexander, and Jermika Lang, the State placed Defendant, wearing a red "Reallionaire" sweatshirt, at the Wallace home, near the Academy, in the backseat of Ms. Lott's grandfather's car at the Taco Bell drive-thru, and later at the scene of the crime at pertinent times that evening.  Deputy Rauch testified that all three victims' wounds were consistent with the shooter firing a 9 mm/.380 caliber gun from the back seat of the vehicle. Montrell testified that Defendant was known to carry (what he believed was) a 9 mm gun with an extended clip. Ms. Wallace and Montrell testified that they saw Defendant with a gun at the house that evening. Ms. Wallace further testified that Defendant always had a gun on him, and he paid her son five dollars so he would comply with her wishes to remain at home because it was late.  Ms. Wallace and Montrell identified Defendant in the surveillance videos and recognized that Defendant wore the same clothes he wore while visiting their home and watching the football game. Lionel Alexander saw a car crash into a pole and watched Defendant, who he recognized from the way he ran, run across Airline Highway and the bingo hall parking lot. Jermika Lang heard four gunshots and a car crash. She initially told police that she observed a man in a red sweatshirt running away from the scene of the car crash.

Detective Buttone testified that phone records placed Defendant at the Taco Bell and Academy at all relevant times. Additionally, Defendant and Terry Lloyd, who had threatened the family earlier that day and was known to be in conflict with Malcolm, communicated, mostly through text messages, several times before and after the homicides.

As to count four, possession of a firearm by a convicted felon, the State presented circumstantial evidence that established that Defendant possessed a firearm when he shot the three victims. Ms. Wallace and Montrell testified that

they saw Defendant in possession of a gun at the house before the shootings. Also, the State and the defense stipulated that Defendant had prior convictions of enumerated felonies, although proof of only one such prior conviction was necessary. Further, Defendant testified that he had prior felony convictions. The State also proved that less than ten years had elapsed since the completion of the sentence for the prior felony conviction.

A reviewing court must consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008, 1018. In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297. We note that there were some discrepancies in the testimony. Mr. Alexander and Ms. Lang's statements to the police and their testimony at the two trials were inconsistent and not necessarily reconcilable. There were also varying reports between Ms. Wallace and Montrell regarding what Defendant wore that night. It also appears that Mr. Alexander possibly received a benefit from testifying *after* the trial, so Defendant could not explore whether he had an incentive to falsify his testimony. However, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008, 1018.

The jury considered the testimony of the witnesses and had to make credibility determinations. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 382, *writ not considered*, 19-1869 (La. 1/28/20), 288 So.3d 123. Absent internal

contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Washington*, 16-732 (La. App. 5 Cir. 4/12/17), 219 So.3d 1221, 1226. In cases relying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of the defendant's guilt beyond a reasonable doubt. *State v. White*, 07-831 (La. App. 5 Cir. 3/11/08), 982 So.2d 843, 846, *writ denied*, 08-846 (La. 10/31/08), 994 So.2d 534. *State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008, 1018. In this case, the jury did not credit Defendant's testimony that he did not go to Academy and Taco Bell with the victims, that he was not the person in the red hoodie that witnesses observed running away from the scene of the crime, and that he lacked specific intent to kill the victims because he was a family friend and had no motive to kill his long-time friends.

Considering the foregoing, we find that a rational trier of fact could have found that the circumstantial evidence was sufficient under the *Jackson* standard to support Defendant's convictions of three counts of second degree murder and one count of possession of a firearm by a convicted felon. We also find that the evidence was sufficient for the jury to conclude that the State negated any reasonable probability of misidentification in order to carry its burden of proof under *Jackson*.  *See State v. Cochran*, 09-85 (La. App. 5 Cir. 6/23/09), 19 So.3d 497, 505, *writ denied*, 09-1742 (La. 3/26/10), 29 So.3d 1249 (finding evidence sufficient to identify the defendant and support second degree murder conviction despite lack of direct, physical evidence that placed the defendant at crime scene); *State v. Miller*, 20-182 (La. App. 5 Cir. 12/23/20), 308 So.3d 1246, 1256, *writ*

*denied*, 21-233 (La. 4/27/21), 314 So.3d 838 (finding the State's circumstantial evidence sufficient to support conviction of two counts of second degree murder and to establish that the defendant must have possessed a firearm when he shot the victims).

Last, we find that Defendant's *pro se* assignment of error is without merit. Citing *State v. Acevedo*, 21-164 (La. App. 5 Cir. 5/19/21), 325 So.3d 1117, Defendant contends that, under La. C.Cr.P. art. 857, the effect of granting a new trial is to permit retrial with as little prejudice to either party as if the case had never been tried. He maintains that his defense counsel should have been provided the opportunity to re-urge the pretrial motions in order to put forth new or creative arguments to support the previous motions.

The record reflects that on August 15, 2022, the day before trial began, defense counsel re-urged numerous motions as follows:

> And while we're on the motions, Your Honor, I would - - based on some conversations we had in the very beginning, where we all agreed this was just a Ramos retry, but just out of an abundance of caution I am going to reurge all of the Motions to Suppress Evidence, Statements, Photograph Identifications, and there were - - I'm going to adopt all of the Motions to Suppress and the Motions in Limine tried by the Defense prior to the first trial. I am aware of three Motions in Limine filed by the Defense having to do with photographs, having to do with previous drug arrests, that Mr. Woods has already been convicted of in this courtroom and also there is a Motion in Limine related to daytime pictures; so I would just reurge out of an abundance of caution to protect the record, reurge all of the Motions to Suppress and Motions in Limine that were tried before Your Honor in the first trial.

The prosecutor responded that there had been no change in circumstances that would warrant the trial court to change its earlier rulings. He further responded that the only thing he would add would be with respect to the Motion to Exclude Reference to the drug convictions. The prosecutor explained that he would not adduce any evidence relating to those convictions unless Defendant chose to testify.

The trial judge then denied defense counsel's request, stating:

> You're correct. Mr. Ehle - - I'm sorry, Mr. Freese, there has been nothing to change my rulings where I deny the Motion to Suppress the Evidence, Motion to Suppress the Statement or anything else. With regards to the conviction, Mr. Freese, didn't use in your first trial and as I told you, you won't use it in this one but if your client testifies - - I'm going to leave all my prior rulings in place, okay, where I denied everything.
>                                   [***]
>       And - - just move forward.

In *Acevedo*, *supra*, this Court considered whether as a matter of law all pretrial proceedings or rulings rendered in connection with a defendant's first trial should be set aside and rendered null and void when a defendant is granted a new trial pursuant to *Ramos*. We found that La. C.Cr.P. art. 857 and the relevant jurisprudence mandated that the relator be given the opportunity to raise any new motions in preparation for his defense at his new trial. *Acevedo*, 325 So.3d at 1121. We also found that the trial court *may* reconsider any pretrial motions or evidentiary rulings previously considered, should counsel show that good cause exists which warrants reconsideration of the previously considered motions. *Id.* In Defendant's case, his counsel re-urged the motions "in an abundance of caution" but did not show good cause whereby the district court could justify reconsidering the motions. *See Acevedo*, *supra*. Therefore, we find that the district court did not commit error when it rested on its previous rulings.

*ERRORS PATENT*

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

The mandatory fine on count four (possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1) of "not less than one thousand dollars nor more than five thousand dollars" was not imposed; however, this Court has previously exercised its discretion to decline to correct an illegally lenient sentence

in the case of an indigent defendant. *See State v. Fisher*, 19-488 (La. App. 5 Cir. 6/24/20), 299 So.3d 1238, 1249. Here, Defendant is represented by the Louisiana Appellate Project, which represents indigent defendants in non-capital felony cases. Therefore, due to Defendant's indigent status, we decline to remand this matter for imposition of the mandatory fine as to count four. *See State v. Manuel*, 20-172 (La. App. 5 Cir. 6/2/21), 325 So.3d 513, 570-71, *writ denied*, 21-926 (La. 10/12/21), 325 So.3d 1071.

## *DECREE*

Considering the foregoing, Defendant's convictions and sentences are affirmed.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 15, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-KA-41

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DONALD A. ROWAN, JR. (DISTRICT JUDGE)
ANNE M. WALLIS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

**MAILED**
PRENTICE L. WHITE (APPELLANT)
ATTORNEY AT LAW
LOUISIANA APPELLATE PROJECT
16731 CICERO AVENUE
BATON ROUGE, LA 70816

COREY WOODS #511562 (APPELLANT)
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712

DOUGLAS W. FREESE (APPELLEE)
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
JENNIFER C. VOSS (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053